UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Xiyue Wang | : | |
| | : | |
| and | : | Civil Action No. _____ |
| | : | |
| Hua Qu | : | |
| | : | |
| and | : | |
| | : | |
| S.Q. | : | |
| By and through his Natural Guardians | : | |
| Hua Qu and Xiyue Wang | : | |
| | : | |
| and | : | |
| | : | |
| Kexu Lan | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| THE ISLAMIC REPUBLIC OF IRAN | : | |
| Hossein Amirabdollahian, Minister of Foreign Affairs | : | |
| Ministry of Foreign Affairs | : | |
| Khomeini Avenue | : | |
| United Nations Street | : | |
| Tehran, Iran | : | |
| | : | |
| Defendant. | : | |

## **COMPLAINT**

1.     This action is brought by the Plaintiffs, by and through their counsel, in the individual capacity of each Plaintiff for their own benefit, and/or for the benefit and on behalf of all those legally entitled to assert a claim under the Foreign Sovereign Immunities Act 28 U.S.C. § 1605A(c). Plaintiffs, by counsel, respectfully bring this action against Defendant, Islamic Republic of Iran ("Iran"), for severe personal injuries and other irreparable harm, which the

Plaintiffs have suffered as a result of the Defendant's hostage taking, torture, personal injury and related torts.

## JURISDICTION, VENUE, AND CHOICE OF LAW

2.      This Court exercises subject matter jurisdiction in accordance with the provisions of 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), and 1605A.

3.      Iran has been designated as a State Sponsor of Terrorism by the United States Department of State since 1984 and continues to have been so designated to the present day.

4.      Iran is subject to suit in the courts of the United States pursuant to 28 U.S.C. § 1605A ("FSIA").

5.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign State may be brought in the United States District Court for the District of Columbia.

6.      Actions for hostage taking, torture, personal injury and related torts perpetrated by foreign state sponsors of terrorism through their officials, employees, and agents within the meaning of 28 U.S.C. § 1605A(c) are unique causes of actions arising out of federal counterterrorism statute(s) and are controlled by applicable federal law.

## THE PARTIES

### A.  The Plaintiffs

7.      Plaintiff Xiyue Wang ("Mr. Wang") was and, at all times relevant hereto, is a citizen of the United States.  Mr. Wang was a Ph.D. student at Princeton University, studying Eurasian history of the late nineteenth and early twentieth centuries, when, as described more particularly below, Mr. Wang travelled to Iran on multiple occasions to continue to improve his Persian language skills and to conduct research for his dissertation.

8.     On August 7, 2016, Mr. Wang was detained, his passport was taken, he was arrested, taken hostage and caused to be imprisoned on false charges by the Defendant. In a bogus trial, which lacked all due process, Mr. Wang was "tried" and convicted in Iran's Revolutionary Court. He was convicted of Collaboration with Hostile State as an infiltrator and a spy and sentenced to ten years of imprisonment. He spent exactly forty months (1,216 days) in Iran's notoriously brutal Evin Prison and was under Iranian custody as a hostage, used by Iran to extort the United States for political gains.  During his wrongful imprisonment, Mr. Wang was tortured and mistreated in numerous respects.  At the time of the acts alleged, and at all other times relevant hereto, Mr. Wang was a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A.

9.     Plaintiff Hua Qu ("Ms. Qu") is and was, at all times relevant hereto, the wife of Xiyue Wang and a permanent resident of the United States. As a result of the acts of Iran, Ms. Qu has suffered severe mental anguish and extreme emotional pain and suffering.

10.     Plaintiff S.Q. is and was, at all times relevant hereto, the son of Xiyue Wang and Hua Qu and a United States citizen. S.Q. is a minor born March XX, 20XX who lives with his father and mother.  As a result of the acts of Iran, S.Q. has suffered severe mental anguish and extreme emotional pain and suffering.

11.     Plaintiff Kexu Lan ("Ms. Lan") is and was, at all times relevant hereto, the mother of Xiyue Wang and is a United States citizen.  As a result of the acts of Iran, Ms. Lan has suffered severe mental anguish and extreme emotional pain and suffering.

**B.  The Defendant**

**The Islamic Republic of Iran**

12.     Defendant Islamic Republic of Iran is a foreign state that has been designated and

continues to remain designated by the United States of America federal government as a State Sponsor of Terrorism pursuant to § 60 of the Export Administration Act of 1979 (50 U.S.C. App. § 2405) and § 620(A) of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371) at all times since January 19, 1984.

13.     The Islamic Republic of Iran, and its instrumentalities, including, but not limited to, the Iranian Ministry of Intelligence ("MOIS") and Iranian Revolutionary Guard Corp ("IRGC"), through its actions, caused and is fully liable and responsible for the injuries described herein, within the meaning of 28 U.S.C. § 1605A.

## Facts

14.     Xiyue Wang at all times relevant hereto was a Ph.D. candidate at Princeton University in New Jersey, specializing on Eurasian history of the late nineteenth and early twentieth centuries.

15.     In February 2015, after consulting with and at the urging and direction of his academic advisor and others at or affiliated with Princeton University, Mr. Wang applied for an Iranian student visa to study at a summer Persian language program at the Dehkhoda Lexicon Institute and International Center for Persian Studies ("Dehkoda Institute").  Mr. Wang expected that he would study at the Dehkoda Institute in the summer of the 2015.  He did not hear back on his visa application until November 18, 2015, when he received an email from the Dehkoda Institute that his visa had been approved.

16.     On January 26, 2016, Mr. Wang travelled to Iran to participate in the Dehkoda Institute Persian language program for which he had been accepted.

17.     On March 9, 2016, after having completed the first course of his Dehkoda Institute language program, Mr. Wang returned to his family in New Jersey for an extended break around

the Iranian New Year before beginning his second course in the Dehkhoda Institute language program. Again, with the advice and encouragement of his Princeton advisors, he travelled to Iran on April 30, 2016 to both complete an additional course of language study at Dehkhoda Institute, and this time to conduct research for his Ph.D. at the Iranian National Library and Archives.

18.     Shortly after his arrival in Iran for the second time, Mr. Wang began to experience difficulties accessing his Princeton email account.  He conferred with the Princeton's IT staff, which concluded that he was likely hacked by Iranian web police.  Similarly, his Iranian phone started to experience delayed connections, frequent cuts and strange noises that led Mr. Wang to believe his phone was being monitored.

19.     Mr. Wang concluded his preliminary research and language work in Tehran and was scheduled to return to New Jersey on July 21, 2016.  On the day before his scheduled flight, he was contacted by agents of MOIS and directed to appear at a police station.  After questioning Mr. Wang at the police station on July 20, 2016, the MOIS agents confiscated Mr. Wang's U.S. passport and laptop, preventing him from leaving the country. He was subsequently arrested on August 7, 2016 on false espionage charges and imprisoned at Ward 209, the high security detention facility of Iran's Ministry of Intelligence in the Evin Prison, where he was interrogated and awaited trial.

20.     Under detention at Ward 209, Mr. Wang spent his first eighteen days in solitary confinement and was subject to lengthy interrogations almost daily without any legal representation, wherein he was repeatedly threatened, slapped and abused. Then after solitary confinement he was incarcerated in a cramped, dirty cell with two to three other prisoners, and no other human contact for ten days. Mr. Wang was then again taken for interrogation.  This next round of interrogation took place in two sessions.  During this additional round of interrogation,

at the end of the first day, Mr. Wang was forced to confess of being a US spy.  He signed a one sentence confession that stated, "I am a spy for the United States.", without which he was advised he would not be eligible for release as a hostage being held by the Islamic Republic of Iran in a prisoner swap with the US.

21.    He was subsequently tried in Iran's Revolutionary Court without presentation of any evidence and without proper defense.

22.    The court convicted him of "Collaboration with Hostile State" as an infiltrator and a spy and sentenced him to ten years of imprisonment.

23.    Up to his trial in the appeal court on August 2, 2017, Mr. Wang spent approximately nine and half months in Evin Prison's Ward 209.  He was then transferred to Evin Prison's general population in Ward 4 and Ward 7, until he was released on December 7, 2019 in a prisoner swap negotiated between Iran and the United States. Altogether, Mr. Wang spent exactly forty months (1,216 days) as a hostage held by Iran to extort the U.S. for political gains.

24.    Mr. Wang's imprisonment was deemed "unlawful" by the US government and "lack[ed] legal grounds" by the UN Working Group on Arbitrary Detention. It inflicted great physical and mental suffering not only on Mr. Wang, but also his entire family, especially his wife, Hua Qu, young son, S.Q., and his mother, Kexu Lan.

25.    Mr. Wang was not able to see any of his family members during his imprisonment, and he found it particularly painful, psychologically devastating and heart wrenching to have missed almost four years of his son's seven years of life.

26.    Having been unlawfully detained in the prime years of his mid-thirties, Mr. Wang also suffered irreversibly in his academic and professional life, all to his damage.

**Confiscation of Passport and Arrest**

27.     Mr. Wang was due to return to New Jersey very early in the morning of July 21, 2016. On the afternoon of July 20, 2016, he was doing some last moment book shopping before getting ready to leave for the airport. At around 2:00pm, Mr. Wang realized that he had more than 10 missed calls from a "private" number. Soon he received another call from the undisclosed number.  Mr. Wang answered. Someone on the other side of the phone told Mr. Wang that he was a police officer, he had some questions about Mr. Wang's activities in Iran and he asked Mr. Wang to go to the Diplomatic Police Station on Ferdowsi Street with his passport and computer for questioning. Mr. Wang immediately went to the designated Diplomatic Police Station. Mr. Wang waited for about an hour there, then two men in plain clothes arrived from outside. After his arrest on August 7, 2016, Mr. Wang would learn that they were agents of MOIS. One of them was an interrogator, the other was an interpreter.

28.     In the first questioning session, the interrogator appeared to be polite. He first examined Mr. Wang's U.S. passport and asked Mr. Wang through the interpreter whether he was a Chinese citizen. Mr. Wang told him that he was not a Chinese-American dual citizen, but only a U.S. citizen. Mr. Wang did have Chinese visas in his passport as a result of travel to China.

29.     The interrogator proceeded to ask Mr. Wang mostly basic questions, such as Mr. Wang's biographical information, what Mr. Wang studied at Princeton, why Mr. Wang came to Iran. Mr. Wang was asked to write down the answer to every question. In the end, the interrogator told Mr. Wang that he and his colleagues had to investigate Mr. Wang's activities during his time in Iran. They confiscated Mr. Wang's passport, preventing him from taking his flight to leave Iran that was scheduled for the following day.  They also confiscated his laptop computer but allowed Mr. Wang to keep his cellphone. These authorities told Mr. Wang that they would be contacting

him soon. When Mr. Wang was finally let go without his passport and computer, it was already past 7:00pm. The entire interrogation lasted about four hours.

30.    When Mr. Wang walked out of Diplomatic Police Station, the US Interest Section in the Swiss Embassy was already closed, so he immediately called Ms. Qu and sent an email to his advisor at Princeton, Prof. Stephen Kotkin, the then-head of the Iran Center Prof. John Haldon and the Graduate Program Administrator at the History Department Kristy Novak at Princeton to explain the situation. Ms. Novak then escalated the issue to Ms. Anastasia Vrachnos, the vice provost for International Affairs at Princeton. In the same evening, Mr. Wang wrote a long email outlining what happened at the Iranian Interest Section in Washington D.C.

31.    From July 20, 2016, when his passport was confiscated, until July 25, 2016, Mr. Wang waited to be contacted by Iranian authorities and hoped that the Iranian Police would release him so he could return to New Jersey.  During that time, he was in contact with his wife, Ms. Qu, and officials at Princeton including, but not limited to, Ms. Novak, Prof. Haldon, and Prov. Vrachnos.  He also contacted the Swiss Foreign Ministry about the situation, because although the United States does not maintain formal diplomatic ties with Iran, the Swiss has served as the protecting power of the United States in Iran since May 21, 1980 and the Swiss Embassy's Foreign Interests Section provides consular services to U.S. citizens living or traveling in Iran. Mr. Wang visited the Foreign Interest Section of the Swiss Embassy on July 24, 2016 to discuss the situation with the Swiss diplomats there.

32.    On July 25, 2016, Mr. Wang received a call from the MOIS interrogator's interpreter asking him to go to the same diplomatic police station again for questioning. The interrogator questioned Mr. Wang for another three to four hours, with the similar kind of questions as in the previous interrogation. The interrogator threatened that he might arrest Mr. Wang and

asked if Mr. Wang had gone to the National Archive again. Mr. Wang said no, as he had not done so.

33.     The MOIS officials again refused to return Mr. Wang's passport and, and Mr. Wang was again instructed to wait for further information.

34.     On August 3 and 4, 2016, multiple U.S. media outlets reported the newly revealed details of the Obama Administration's $1.7 billion dollar cash payment to Iran that had been made in January 2016. As described in more detail below, in exchange for Iranian prisoners and the return of these funds that had been confiscated as part of U.S. sanctions, Iran had agreed to the release of U.S. citizens being held in Iran. Mr. Wang feared he would be arrested by Iran and held as a hostage so Iran could seek more ransom from the United States.

35.     On August 7, 2016, Mr. Wang received a call from the interrogator's interpreter at around 8:30 am. He was asked to go to a certain suite at the Azadi Hotel in northern Tehran immediately. Mr. Wang informed his wife and set out to the designated location. In the hotel suite, the interrogator had Mr. Wang's laptop and passport on the coffee table. He told Mr. Wang that having examined Mr. Wang's computer and investigated his work in the archives, the Iranian authorities had come to the conclusion that he did not do anything to violate Iranian law and that they were going to return his passport and computer and let him leave the country. The interrogator told Mr. Wang that his team was going to take Mr. Wang to his residence to pick up his belongings and then send him to the airport. Mr. Wang asked to contact the Swiss Embassy, so that the Swiss Embassy could send him to the airport. The interrogator told him he could call the Swiss and ask the Swiss to wait for him in the airport, but as a rule, the Iranian authorities must take him to the airport.

36.     Mr. Wang was ushered into a small sedan waiting outside the hotel lobby. He was

taken back to his residence and was allowed to go to collect his belongings alone. In the apartment, Mr. Wang spoke to the Swiss Embassy on the phone and the Swiss Embassy told him that the deputy chief of the Foreign Interests Section would rendezvous with Mr. Wang at Imam Khomeini International Airport in Iran and make travel arrangements for him there. Mr. Wang also called his wife hastily around 10:30 am, telling her that the Iranian authorities were taking him to the airport and letting him go, and the Swiss were going to meet with him in the airport.

37.     Instead of taking Mr. Wang to the airport, however, the interrogator and his team took him straight to the Evin Prison. There he was taken to a magistrate's office, and the magistrate announced his arrest under espionage charges. Then Mr. Wang was taken to Ward 209, the detention facility of the Iranian Ministry of Intelligence. He was stripped down to underwear, forced to put on a blue prison uniform and then taken blindfolded to a solitary cell. The cell was approximately 8 feet by 15 feet, there was nothing in it except a small sink with a water tap, a dirty carpet covering the entire floor, a lamp and a window with bars beyond reach. Mr. Wang collapsed as he was pushed into the cell and the iron door closed behind him. He collected himself a bit, and he started to walk around the cell along the wall and read the scribbles on the wall, he only collapsed again in panic when he read someone had written in English "364 days".

**After Detention Before Trial**

38.     Believing that Mr. Wang was being released and leaving Iran, Ms. Qu became alarmed when she did not hear from him and received no further communications.   She did not know of his arrest and once Mr. Wang was arrested, he was not able to contact his wife or anyone.

39.      After Mr. Wang's disappearance, and with no further communications, on August 8, 2016, Ms. Qu contacted Steve Fagin (head of Iran Desk, State Department) and the Princeton University team for assistance in trying to learn and located her husband.

40.     On August 14, 2016, a week after Mr. Wang's disappearance, Princeton officials told Ms. Qu that a local lawyer had been able to go to Evin Prison and confirmed that Mr. Wang had been arrested and was being held there.  No other information was provided.

41.     During his imprisonment, Mr. Wang was kept under harsh conditions in Ward 209 and developed serious knee pain, enduring and severe headaches, diarrhea, vomiting, allergies and depression, and was forced to endure sexual harassment. He was blindfolded, restrained, and physically abused. An interrogator slapped and yelled in his face, ordering him to stand and sit in specific positions, as if he were a performing animal.

**Trials and Appeal**

42.     On December 10, 2016, there was a two-day hearing in which a case was created against Mr. Wang and a formal trial was set for March 2017.

43.     On April 26, 2017, Mr. Wang was found guilty and sentenced to ten years in prison for "infiltration" based upon spurious allegations that Mr. Wang had "gathered secret and top secret [intelligence]" for the U.S. State Department, among other foreign government entities. The prosecution did not and could not present any evidence of any wrongdoing by Mr. Wang.

44.     With his health rapidly deteriorating and his experiencing as illnesses including but not limited to,  severely swollen knees caused by harsh conditions in his overcrowded cell which held double the number of prisoners than its capacity, his sufferings from sexual harassment, and contemplations of suicide, Mr. Wang considered abandoning any appeal efforts as the prison authority had told Mr. Wang that he would be transferred out of Section 209 to back to general prison Ward 4 where living conditions were better, but only after his verdict was final.

45.     On August 2, 2017, Mr. Wang was tried in the appeal court.  While awaiting the appeals court decision he was transferred to Ward 4, one of the general wards of Evin Prison.

46.     On August 17, 2017, Iranian authorities denied Mr. Wang's appeal, upholding his ten-year prison sentence.

**The Political Environment in Iran at the Time of Mr. Wang's Arrest**

47.     Iran's arrest and detention of Mr. Wang occurred on July 20, 2016, during a very sensitive period in the relationship between the United States and Iran. At the time of the arrest, the United States and other world powers were working on implementing the Joint Comprehensive Plan of Action ("JCPOA"), including the lifting of economic sanctions against Iran in exchange for the dismantling of certain aspects of Iran's nuclear program.

48.     The United States initially imposed sanctions on Iran in 1979, following the Islamic Revolution, when 52 U.S. nationals were taken hostage for 444 days. The two countries have had a contentious relationship ever since. In 1987, the United States imposed an embargo on Iranian goods and services in response to its support of terrorism in the Persian Gulf. Between 1995 and 1997, the United States effectively banned all trade and investment activities with Iran.

49.     In 2006, the U.N. Security Council passed Resolution 1737 and imposed additional sanctions on Iran after it refused to suspend its uranium enrichment program. The U.N. sanctions banned the supply of nuclear-related technology and materials to Iran and froze the assets of individuals and companies related to the enrichment program. These sanctions were strengthened in 2007 and again in 2010.

50.     In 2006 and 2008, China, France, Russia, the United Kingdom, and the United States— the permanent members of the U.N. Security Council—along with Germany (together, the "P5+1") proposed framework agreements to halt Iran's uranium enrichment program. In 2009, the United States announced that it would participate fully in the P5+1 discussions with Iran and the P5+1 met with Iran to discuss the proposals in January 2011. These negotiations were

suspended in the spring of 2013.

51.     In August 2013, newly elected President Rouhani called for Iran to resume serious negotiations with the P5+1 over Iran's nuclear program. Negotiations between the P5+1 and Iran intensified over the following year.

52.     The nuclear negotiations between Iran and the P5+1 caused significant tension between Defendant IRGC and Iranian President Rouhani's comparatively more progressive administration. High-level IRGC officials criticized and sought to undermine the Rouhani administration's efforts to engage with the United States and other Western powers over Iran's nuclear program.

53.     President Rouhani's electoral victory in 2013 was opposed by Iran's hardline factions. Although President Rouhani's election was welcomed as a sign of modest progress toward reform and potential partial reconciliation with the West, Rouhani's authority has remained subject to the authority of the Supreme Leader.

54.     In July 2014, Iran and the P5+1 met in Vienna to discuss a comprehensive nuclear agreement. The parties also announced Iran would convert 25 kilograms of enriched uranium powder into fuel plates that could not be used for weapons and blend down another three tons of enriched uranium to make it unfit for weapons. In exchange for these concessions, the P5+1 committed to repatriating $2.8 billion in funds. The parties agreed to resume talks in August 2014.

55.     These discussions eventually led to the JCPOA on July 14, 2015 between Iran and the P5+1, which was to be followed by an intensive and sensitive period of implementation phases.

**Iran took Mr. Wang Hostage for Political Purposes**

56.     Iran has an extensive, well-documented history of taking American hostages. On the heels of the Islamic Revolution in 1979, Iranian militants seized the American Embassy in

Tehran and took 52 U.S. diplomatic and military personnel hostage. "These hostages remained in Iranian custody for 444 days and were subjected to physical and mental torture and inhumane conditions of confinement."

57. Like Mr. Wang, those hostages were blindfolded; held in isolation; provided minimal clothing, food, water, and medical care; and prohibited from communicating with one another or their families. The hostages were subjected to repeated interrogations and threatened with physical injury. The hostages ultimately were released after the United States agreed to unfreeze Iranian assets in the United States and terminate all legal proceedings against Iran in U.S. courts.

58. During the ensuing four decades, Iran has consistently targeted American citizens for hostage taking and has sponsored, supported and/or committed numerous heinous acts of terror, including the murder and maiming of U.S. citizens and others, with devastating effect upon their families.

59. Following their past pattern and practices, Defendant plainly had the state of mind of a hostage taker and repeatedly communicated their intent to take and use Mr. Wang as a hostage.

60. During Mr. Wang's time in Evin Prison, Iranian guards, interrogators, and other officials in the Iranian judiciary repeatedly stated to Mr. Wang that he would be used as a bargaining chip in a prisoner exchange.

61. During Mr. Wang's first interrogation on July 20, 2016, his United States passport was confiscated. From the beginning, Mr. Wang was told that if he cooperated and answered the questions of the MOIS interrogators he would be possibly released, but Iran continued to hold him and his passport as a means to control Mr. Wang and induce his compliance with their interrogation and demands.

62.     On the day of his arrest, Mr. Wang was told by the Iranian police that over the course of their investigation, they found he did nothing wrong.

63.     Mr. Wang was repeatedly told that he was being held so that Iran could achieve a deal with the United States to obtain money and Iranian prisoners being held by the United States.

64.     As reported in a wide variety of media sources, Iranian officials' various public statements demonstrate that Iran arrested and imprisoned Mr. Wang as a hostage for whom it could obtain persons or assets of value in an exchange with the United States. For example: In September 2015, President Rouhani suggested that "[i]f the Americans take the appropriate steps and set [Iranian prisoners] free, certainly the right environment will be open and the right circumstances will be created for us to do everything within our power and our purview to bring about the swiftest freedom for the Americans held in Iran as well."

65.     Mr. Wang's arrest and detention occurred approximately 6 months after journalist Jason Rezaian was returned to the United States on January 16, 2016, in a prisoner exchange with Iran.  At that time Mr. Rezaian and 3 other American hostages being held in Iran were released in exchange for 7 Iranians detained in the United States.

66.     In addition to the prisoner exchange, that same day, the United States returned $1.7 billion in frozen assets.  Iranian officials boasted that the release of the funds was made in return for the release of Mr. Rezaian and 3 other American hostages.   Thus, Iran was emboldened not only to take Americans hostage to facilitate prisoner exchanges, but also because it was able to obtain the return of funds that had previously been confiscated as part of U.S. sanctions.

67.     On July 16, 2017, Iran's Mizan News broke Mr. Wang's case to the media.

68.     On July 24, Mizan News reported that Iran demanded a prisoner exchange for the release of five identified Iranians imprisoned in the United States.

69.     Over two years later, Mr. Wang was ultimately released in a prisoner exchange after 40 months of detention.

**Efforts Leading to Release**

70.     From the day of Mr. Wang's arrest until his release, Ms. Qu worked tirelessly out of their home in the State of New Jersey to get her husband freed.

71.     Trying to get her husband released, Ms. Qu wrote letters, published articles and conducted a series of interviews to defend Mr. Wang's innocence and spotlight the hardship he had been through. Ms. Qu reached out to many media outlets and spoke with the Today Show on NBC News, Fox News, ABC News and RFI. These interviews led to other connections which later offered help to focus attention on Mr. Wang's plight and to secure Mr. Wang's release.

72.     Among the ongoing efforts were, *inter alia*, an April 2018 op-ed published by Jason Rezaian published after his meeting with Ms. Qu.  The article advocated for the passage of legislation including H.R. 4744, that had passed the U.S. House of Representatives on April 26, 2018 calling for Mr. Wang's release.  Ms. Qu also worked tirelessly to obtain letters from religious authorities, including Archbishop Christophe Pierre requesting assistance and cooperating in providing information to interested news agencies who were writing about Mr. Wang's hostage ordeal.

73.     To advocate for her husband's release, Ms. Qu had to leave her young son alone in the New Jersey home for extended periods of time, which caused great fear for S.Q. and also much distress for Ms. Qu, compounding the trauma each was already suffering due to Mr. Wang's false imprisonment.

74.     Over the course of her husband's detention, Ms. Qu met with officials from both the United States and Princeton, appeared on media interviews, and met with countless reporters

to draw attention to Mr. Wang's case and put pressure on the Defendant to release him.

75.    This required travel and extended absences from her son and executed a heavy physical, emotional, and financial toll.

76.    While Ms. Qu worked on gaining support from news agencies and government various government officials, Ms. Lan also worked to raise public awareness about her son's ordeal from her home in Washington State.  Ms. Lan with the University of Washington's Human Rights Center to hold vigils and organize public awareness campaigns to call for Mr. Wang's release.  Ms. Lan travelled to Princeton and met with Princeton officials to demand that more be done to bring Mr. Wang home.

**Prisoner Exchange**

77.    On December 7, 2019, due to the concerted efforts of Ms. Qu, her private counsel, members of the U.S. Congress, and the Trump Administration, Mr. Wang was freed from Iran via a prisoner exchange.

78.    Ms. Qu learned at midnight that Mr. Wang had been released and this was confirmed by Mr. Wang's phone call from a Swiss Air Force airplane leaving Tehran.

79.    Mr. Wang was unlawfully held by the Islamic Republic of Iran for 40 months, in violation of U.S. and International law.

**Aftermath of Mr. Wang's Lengthy Imprisonment in Iran**

80.     Mr. Wang's unlawful arrest and subsequent detention have caused severe and enduring and unbearable physical, psychological and emotional injuries and other pain and suffering, which injuries are ongoing, all to his damage.

81.    He suffered from malnutrition and lost 9 kilograms (approximately 20 pounds) in first 18 days of his confinement.  He continues to be affected by these physical injuries and has

required ongoing medical care since his release.

82.     In addition, throughout his detention, at various times, Mr. Wang was held, without cause in solitary confinement for extended periods of time causing him psychological distress and mental psychosis.  While in solitary confinement, Mr. Wang was kept in a filthy cell with no human interaction except during interrogation.  He was subjected to torture and extreme isolation. The brutal conditions, relentless interrogations and sexual harassment caused Mr. Wang to attempt suicide.

83.     During his imprisonment, Mr. Wang suffered severe depression and emotional anguish.  He worried constantly for his wife's, son's and mother's health and safety.

84.     Mr. Wang has sought and continues to seek medical care from professionals to help treat him for his injuries.

85.     Mr. Wang continues to suffer from anxiety, depression, sleeplessness and other symptoms

86.     These injuries continue to significantly impact Mr. Wang's ability to lead a normal life including making it difficult for him to reintegrate into family life. He became detached from his family and friends and fears that the impact of his experiences at the hands of the Iranians will be permanent.

87.     Mr. Wang's imprisonment has also disrupted his relationship with his wife. As a result of his imprisonment and torture, the comfort that Mr. Wang and Ms. Qu once provided each other has been disrupted and continues to suffer, all to their loss and detriment.

88.     Mr. Wang's imprisonment has had lasting negative repercussions on his son, during a critical time in childhood development.

89.     During his Mr. Wang's imprisonment disrupted his relationship with his mother.

Mr. Wang had great anxiety and fear over the suffering his mother was going through. He has become detached from his family and friends and fears the impact of his experiences, at the hands of the Iranians, will be permanent.

90.     In addition, his wife Ms. Qu suffered extreme and unbearable emotional distress, the loss of society and support of her husband and was compelled to set aside her own career development in order to take care of their young son and advocate for her husband's case, while working full time.  She was diagnosed with depression in 2018 and prescribed medication by a psychiatrist in New Jersey.

91.     Mr. Wang's son S.Q. also suffered greatly.  He began to act out in his school and as expressed by his teachers and caregivers had deep anger issues.  He became resistant to authority.  In 2016, shortly after his father's arrest, S.Q. began to see a child psychologist to help him cope with the arrest and disappearance of this father.  He continued his therapy until March 2020, when he was no longer able to receive in-person counseling because of COVID-19.

92.     In addition to the injuries Mr. Wang's wife and son suffered, Mr. Wang's mother, Kexu Lan suffered unbearable injury.  Ms. Lan suffered from depression and anxiety.  Upon learning of her son's arrest, these conditions were greatly exacerbated, and she required medication.  In addition, Ms. Lan developed a serious eye condition, which was made worse by the constant crying that she endured during her son's illegal detention.

93.     Mr. Wang also suffered direct financial loss as a result of his unlawful arrest and detention.  Although he attempted to return to his academic life at Princeton upon his return, he faced tremendous difficulties and was unable to do so.

94.     Mr. Wang also lost personal property because of his imprisonment in Iran.  He has incurred significant expenses since returning from Iran to rebuild his family and professional life.

95.     In addition to the injuries suffered by Mr. Wang detailed above, Ms. Qu suffered her own injuries as a result of her husband's unlawful imprisonment.

96.     Among these were chronic stomach pain, migraines, worsened psoriasis, sleeplessness, depression, anxiety, constant nightmares, and extreme fear. Ms. Qu sought mental health counseling from a therapist near her home in New Jersey and was prescribed medication to treat her depression and anxiety. She experienced extreme depression and anxiety when she thought about the torture and prison conditions her husband was experiencing in Iran. She also worried about the toll the detention of her husband was taking on her mother-in-law, Ms. Lan.

97.     Ms. Qu's entire life as working for her husband's release became a second full time job. Not only was she trying to support her family and young son with full-time employment in Lawrence Township, New Jersey, but she also worked tirelessly to advocate for her husband's release, including organizing a grassroots campaign, engaging in government advocacy and private diplomacy, managing public relations, and mobilizing a group of graduate students to provide moral and intellectual support to Mr. Wang.

98.     Ms. Qu also worries about the lasting implications on her son, S.Q, and what the absence of his father during his critical years of child development have caused.

99.     Mr. Wang's imprisonment has also disrupted the marital relationship Ms. Qu and her husband once had.  As a result of his imprisonment, the society and comfort that Mr. Wang and Ms. Qu once provided each other has been disrupted and continues to suffer.

100.    Mr. Wang's imprisonment also caused Ms. Qu's career development to be delayed and disrupted, as she had to spend considerable amount of time working on Mr. Wang's case throughout his imprisonment and therefore could not concentrate on building her own career. Ms. Qu is still struggling with the consequences of a disrupted and difficult transition.

101.    Ms. Qu was forced to spend significant sums of money arranging for childcare for her son, to allow her to advocate for Mr. Wang's release, and continue her own work and studies in New Jersey, which would otherwise not be needed had her husband not been held hostage by the Defendant. Ms. Qu's parents took rotation to fly from Beijing to Princeton, New Jersey to help Ms. Qu. During a period of four years, Ms. Qu's parents hardly spend time together. After Mr. Wang's release, Ms. Qu's father went back to Beijing and was later diagnosed of exacerbated cardiovascular conditions.

102.    Iran's imprisonment of Mr. Wang also caused his son, S.Q., to be deprived of the service, society, guidance, solatium and consortium of Mr. Wang and to suffer extreme mental anguish and emotional pain and suffering.

103.    Following his father's imprisonment, S.Q. suffered nightmares, started to exhibit behavioral problems and disconnected emotionally from his father refusing to speak with Mr. Wang when he would call from prison.  In addition to enduring a physically absent father, S.Q.'s development was hindered by an emotionally distracted mother as Ms. Qu spent the duration of Mr. Wang's imprisonment consumed with securing his release.

104.    Not only was S.Q. denied the parental guidance from his father at this time, because Ms. Qu was working tirelessly for her husband's release, she was required to leave S.Q. for extended periods of time, sometimes multiple days and weeks which caused S.Q. additional fear anxiety regarding the absence of his mother.

105.    S.Q. spent many more hours with babysitters, caregivers and families from his daycare, which would otherwise not been necessary had his parents been able to be fully present in his life at this time.

106.    Today, S.Q. continues to suffer from ongoing anxiety and other symptoms of

childhood PTSD and other damaging conditions.

107.    Mr. Wang's mother, Kexu Lan, has also been injured by Iran's imprisonment of her son, all to her damage.

108.    Ms. Lan lost the services, society, guidance, and solatium of Mr. Wang, and she continues to suffer extreme mental anguish and emotional pain and suffering.

109.    Ms. Lan had to witness that her son was being held and languishing in Evin prison for years on end.  She suffered the fear and anguish as a mother, that her son would not survive. She lived in terror knowing that her son was being held in unimaginable conditions and that he was being tortured.  She feared that her son would not survive and she would never see him again.

110.   Today, Ms. Lan continues to suffer from ongoing anxiety and continues to fear for the health and safety of her son, and his family.  She fears that her son's imprisonment has forever traumatized their family, and they each will never be able to fully recover.

### COUNT I
### 28 U.S.C. §1605A(c)
### (on behalf of All Plaintiffs except Ms. Qu)

111.    Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

112.    As recounted above, the hostage taking and unlawful imprisonment of Mr. Wang was caused by a willful and deliberate act of terror committed by the Islamic Republic of Iran, as it was a hostage taking or torture committed by a foreign state or their officials, employees or agents of such foreign state which caused the personal injuries to the Plaintiffs.

113.    Seizing an individual in an effort to extract concessions from the United States and others is within the definition of hostage taking within the definition of the FSIA.

114.    Mr. Wang was seized on July 20, 2016, when unidentified agents of the Defendant's demanded he appear for interrogation and his passport was confiscated.

115.  Mr. Wang was arrested and held at Evin Prison, a facility notorious for its brutal mistreatment of political prisoners, and was imprisoned without due process.  Mr. Wang was imprisoned for 1,216 days.  During much of this time, Mr. Wang was denied access to competent counsel, and spent much of his time in solitary confinement or in horrible prison conditions that subjected him to torture, sexual harassment and psychologically and physically damaging conditions.

116.  Throughout his confinement, statements were made to Mr. Wang by government officials and prison authorities which indicated he was being held to extract further concessions from the United States, such as prisoner exchanges.

117.  The legal proceedings which Mr. Wang were afforded were sham proceedings created only for pretextual purposes.  Mr. Wang did not receive due process, he was not able to present a meaningful defense to the bogus charges brought against him although there was no evidence of any unlawful activities which Mr. Wang allegedly committed.  Mr. Wang was forced by the Defendant to sign a confession.

118.  Mr. Wang was released on December 7, 2019, in a high value prisoner exchange arranged by United States, Switzerland, and individuals including Rep. Slattery and former Gov. Richardson.

119.  As a direct and proximate result of the willful, wrongful and intentional acts of the Defendant hereinabove described, the Plaintiffs suffered numerous injuries including but not limited to physical and psychological injuries, emotional injuries, loss of solatium and other pain and suffering as a direct result of the Defendant's unlawful and brutal detention and abuse of Mr. Wang. The full measure of Plaintiffs' injuries are likely not yet known.

120.  Mr. Wang's imprisonment has resulted and will continue to result in economic injury to the Plaintiffs and has caused them to suffer significant financial losses, to date and in the future,

in amounts as will be proven.

121.   WHEREFORE, the Plaintiffs and each of them demand that judgment be entered against the Defendant for pain, suffering, mental anguish, emotional distress, and solatium in amounts to be proven, and for their costs expended, including attorneys' fees, and as otherwise as permitted by this Court.

## COUNT II
## Torture pursuant to the Torture Victims Protection Act 1991 (28 U.S.C. 1350 note)
## (On behalf of Mr. Wang)

122.   Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

123.   Under the FSIA, torture is defined to "have the meaning given in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. §1350 note)" ("TVPA").   28 U.S.C. §1605A(h)(7).   The TVPA defines torture as "any act directed against an individual in the offender's custody or physical control, by which severe pain or suffering….whether physical or mental, is intentionally inflicted on  an individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that the individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind."   Pub. L. No. 102-256 § 3(b)(1), 106 Stat. 72, 73 (1992) codified at 28 U.S.C. § 1350 (note).

124.   Mr. Wang was in the custody of the Defendant for 1,216 days from August 7, 2016 to December 7, 2019.   During that time, Mr. Wang was relentlessly interrogated.   He was subjected to constant threats, including death and dismemberment, as well as brutal abuse, sexual harassment, and caused to suffer unbearable pain, anguish and unbearable physical and emotional mistreatment, all to his damage.

125.   Mr. Wang was also subjected to grueling interrogation sessions involving severe

physical and psychological strain.  He was intimidated, disoriented, blindfolded, transported around the prison, denied access to competent legal counsel, denied visitation by foreign government representatives and family members or friends, physically threatened, psychologically abused and faced with threats to his safety.

126.  Mr. Wang was denied adequate nutrition, denied access to competent medical care or sanitary facilities.  This deprivation of basic care caused Mr. Wang significant physical injury including the 9 kilos (almost 20lbs) during his detention.

127.  Mr. Wang's confinement constitutes torture within the meaning of the FSIA and TVPA.

128.  Defendant's torture of Mr. Wang resulted in severe physical injuries, and psychological and emotional injuries, including post-traumatic stress disorder.

129.  WHEREFORE, Mr. Wang demands that judgment be entered against the Defendant for the torture, pain, suffering, mental anguish, emotional distress and other losses and damages in such amounts as shall be proven, and for his costs expended, including attorneys' fees, and as otherwise as permitted by this Court.

**COUNT III**
**LOSS OF SOLATIUM**
**Under 28 U.S.C. §1605A(c)**
**(On behalf Ms. Qu, S.Q. and Kexu Lan)**

130.  Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

131.  In addition to Mr. Wang, Ms. Qu, her son, S.Q., and Mr. Wang's mother, Kexu Lan, suffered and continues to suffer severe emotional distress, mental pain and suffering and economic damages.

132.  The Defendant's extreme and outrageous conduct of holding Mr. Wang hostage and

inflicting torture upon him caused Ms. Qu, S.Q. and Kexu Lan to suffer from severe emotional harm, including depression, persistent feelings of guilt, loss of sleep, paranoia, other symptoms of post-traumatic stress disorder, loss of the comfort and love of their husband, father and son, solatium and other damages, in such amounts as shall be proven.

133.   Accordingly, Mr. Wang's family members bring claims for loss of solatium against the Defendant pursuant to 28 U.S.C. § 1605A(c), or, in the alternative, the laws of the District of Columbia, the State of New Jersey or the State of Washington, as same may apply to the causes of actions asserted herein and arising from the conduct of the Defendant.

134.   WHEREFORE, the Plaintiffs Ms. Qu, S.Q. and Ms. Lan demand that judgment be entered against the Defendant in such amounts as shall be proven for their compensatory damages, and otherwise as permitted by this Court.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (NJ Common Law)
### (On Behalf of all Plaintiffs)

135.   The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

136.   The Defendant's extreme and outrageous conduct of holding Mr. Wang hostage and inflicting torture upon him caused the Plaintiffs to suffer from severe emotional harm, including depression, persistent feelings of guilt, loss of sleep, paranoia, other symptoms of post-traumatic stress disorder and other losses and damages suffered as a result of the wrongful and intentional conduct of the Defendant, in amounts as shall be proven.

137.   As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the Defendant, Plaintiffs suffered severe emotional distress, entitling them to compensatory damages.

138.   Each Plaintiff may assert a cause of action for intentional infliction of emotional

distress against the Defendants in connection with the willful, wrongful, intentional, and reckless actions of the Defendant. Such cause of action may be asserted pursuant to 28 U.S.C. § 1605A(c), or, in the alternative, the laws of the District of Columbia, or New Jersey or Washington State.

139. WHEREFORE, Plaintiffs demand that judgment be entered against the Defendant on behalf of each of them in an amount to be proven for their compensatory damages, and otherwise as permitted by this Court.

**COUNT V**
**PER QUOD (New Jersey Common Law)**
**(On behalf of Ms. Qu)**

140. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

141. At all times relevant herein, the Plaintiff, Hua Qu, was and is the wife of the Plaintiff, Xiyue Wang.

142. During and since returning from his imprisonment in Iran, and due to the trauma and mental and physical injuries suffered there, Mr. Wang has been unable to contribute to housework, home maintenance, childcare, cleaning, cooking, and other household tasks; and his suffered a loss of consortium and the love and affection of and between husband and wife, Mr. Wang and Ms. Qu, all to their damage. As such, Ms. Qu has continued to bear full responsibility for maintaining her family, as she did when Mr. Wang was imprisoned in Iran.

143. During and since returning from his imprisonment in Iran, and due to the trauma and mental and physical injuries suffered there, the love, affection and marriage of Mr. Wang and Ms. Qu has suffered substantially, all to their damage.

144. Prior to Mr. Wang's imprisonment in Iran, he contributed substantially to housework, home maintenance, childcare, cleaning, cooking, and other household tasks.

145.  Prior to Mr. Wang's imprisonment in Iran, he had a very loving, warm and intimate relationship with his wife, Ms. Qu.

146.  As a direct and proximate result of the willful, wanton, reckless, and grossly negligent conduct of the Defendant as previously set forth, the Plaintiff, Ms. Qu, sustained the loss of services, society, financial support, and consortium of her husband.

147.  WHEREFORE, the Plaintiff, Hua Qu, demands that judgment be entered on this count against the Defendant, for compensatory damages interest, and costs of suit, an award of attorney fees and such other relief as to this Court may seem proper and just.

**COUNT VI**
**PUNITIVE DAMAGES**
**(Under 28 U.S.C. § 1605A(c))**
**(On behalf of all Plaintiffs except Ms. Qu)**

148.  The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

149.  The actions of the Islamic Republic of Iran, which has been committing, sponsoring, and supporting acts of international terror against Americans and others at least since 1979, and certainly since 1984 when it was designated as a State Sponsor of Terror; are heinous in nature, politically motivated, and intentionally target the United States of America and its citizens.

150.  The acts of the Defendant, carried out by their agents as described above, were malicious, willful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations. The hostage taking and torture endured by Mr. Wang and as described above was intended to and did extract extreme pain and suffering on Mr. Wang, his family and to extract concessions from the United States. In accordance with the provisions of 28 U.S.C §1605A(c) the Plaintiffs are thereby entitled to a maximal award of punitive damages to the fullest extent of the law.

151.  The actions of the Defendant, as set forth hereinabove, were intentional and malicious

and in willful, wanton, and reckless disregard of Mr. Wang's rights and physical well-being. The actions of the Defendant were part of its ongoing and continuing campaign of hostage taking and terror committed against citizens of the United States of America to affect U.S. foreign policy in the region, and to use of hostage taking and terror as a means of obtaining concessions from the United States, including high value prisoner exchanges. A maximal award of punitive damages is requested as against Defendant in accordance with the provisions of 28 U.S.C. §1605A(c), which is liable for punitive damages.

152. WHEREFORE, the Plaintiffs pray that judgment be entered against the Islamic Republic of Iran in an amount determined by this Court to deter the Defendant from further hostage taking and torture of American citizens.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, request this Court find the Defendant liable for the Causes of Action listed above and enter Judgment against the Defendant as follows:

1. Awarding Plaintiffs compensatory damages against the Defendant in amounts set forth herein and as shall be determined at trial in accordance with evidence to be submitted to this Court;

2. Awarding Plaintiffs solatium damages against the Defendant, in amounts set forth herein and as shall be determined at trial in accordance with evidence to be submitted to this Court;

3. Awarding Plaintiffs punitive or exemplary damages against Defendant jointly and severally, in amounts consistent with evidence as shall be determined at trial in accordance with evidence to be submitted to this Court;

4. Awarding Plaintiffs prejudgment interest and post judgment interest as computed and calculated at the maximum rate allowable by law;

5. Awarding Plaintiffs their costs and disbursements and reasonable allowances of reasonable fees for Plaintiffs' counsel and experts and reimbursement of expenses;

6.      Leave to amend this Complaint as the interests of justice may allow; and

7.      Granting any and all such further relief as the Court may deem just and proper.

Dated: March 3, 2022

                    Respectfully submitted,

                    Heideman Nudelman & Kalik, P.C.
                    5335 Wisconsin Ave., Suite 440
                    Washington, DC 20015
                    (202) 463-8018

                    By: */s/Richard D. Heideman*
                        Richard D. Heideman (DC Bar No. 377462)
                        Noel J. Nudelman (DC Bar No. 449969)
                        Tracy Reichman Kalik (DC Bar No. 462055)
                        Joseph H. Tipograph (DC Bar No. 997533)