## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| XIYUE WANG et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>*Defendant*. | Civil Action No. 22-583 (TJK) |

## <u>MEMORANDUM OPINION</u>

Xiyue Wang dreamed of becoming a professor.  Born in China, he came to the United States in 2001 and earned degrees from the University of Washington and Harvard.  Wang then started his Ph.D. at Princeton University, where his advisor recommended that he explore research opportunities in Iran.  Following that suggestion, Wang studied in Iranian archives until his planned departure in mid-2016.  But just hours before he was set to fly home to his wife and young son, Iranian police brought him in for questioning.  Iranian officials, after questioning Wang several times, eventually told him that he could return home.  And they even insisted on taking him to the airport themselves.

Wang did not see the airport for over three years.  Instead, his captors took him to Tehran's notorious Evin prison and placed him in solitary confinement for about three weeks.  Even after his time in that tiny cell, Wang continued to endure interrogations designed to extract a false confession that he was a spy for the United States.  His interrogators did not hide why they were holding him captive: Iran wanted leverage in a prisoner exchange, and obtaining an espionage confession from Wang was critical.  In December 2019, that exchange came to fruition.  Wang returned to his family after being detained for 40 months.

Along with his wife, mother, and son, Wang sued Iran in early 2022. Iran did not show up to defend itself, so the Wangs moved for default judgment, seeking compensatory and punitive damages. No amount of money can make this family whole or give back the time that Iran took. Still, Congress passed the Foreign Sovereign Immunities Act to compensate victims like Wang and their families—and, in doing so, to deter Iran from this kind of unconscionable conduct. Because the Wangs have shown that Iran is liable for what it did to Wang directly and to his family indirectly, the Court will grant the motion for default judgment and award the Wangs some—but not all—of the damages they request.

## I.    Background

### A.    Findings of Fact

Xiyue Wang was born in China before moving to the United States in late 2001 and becoming a naturalized citizen about seven years later. ECF No. 21-2 ("Wang Dec.") ¶¶ 2–3. Shortly after arriving here, Wang studied South Asia, Central Asia, and China at the University of Washington. *Id.* ¶ 10. He then obtained a master's degree from Harvard before returning to China for a few years where he met his now-wife Hua Qu in 2009. *Id.* ¶¶ 10–11; ECF No. 21-5 ("Qu Dec.") ¶ 6. The couple's son, referred to as S.Q., was born in China. Wang Dec. ¶ 4. By 2013, Wang was back in the U.S. and had started his Ph.D. at Princeton University. *Id.* ¶¶ 11–12. He hoped to become a professor with a focus on "Islamic Inner Asia." *Id.* ¶¶ 9, 12.

Wang's advisor encouraged him to "go to Iran to explore research opportunities," so Wang worked with Princeton's Iranian Study Center to obtain "an education visa." Wang Dec. ¶ 15. The "Iranian Interest Section gave [him] a letter" saying that he "was welcome to do research" there. *Id.* ¶ 16. Upon arriving in Iran, Wang requested and received permission from the country's foreign ministry to "research at the library and the archives." *Id.* For other places, he could "request access . . . as needed." *Id.* Wang's "language institute" permitted him to research in the

foreign ministry archives, where he "spent most of [his] time reading through documents." *Id.* ¶ 17. But he also sought access to the Iranian national archives. And that request languished, "neither granted nor denied," despite Wang's weekly prodding for updates. *Id.* So Wang turned to an Iranian contact who had access to the archive's documents and could retrieve them for him— apparently "a rather common scholarly practice." *Id.* ¶¶ 18–19.

Wang planned to leave Iran on August 7, 2016. Wang Dec. ¶¶ 5, 20–21. Just hours before his flight, though, he received a call from an unidentified caller claiming to be the Iranian police— and claiming to have "some questions" for Wang. *Id.* ¶ 21. Following the caller's instructions, Wang went to the "diplomatic police station in downtown Tehran" and was questioned there for about four hours. *Id.* ¶ 22. Wang's questioners were curious about his citizenship, and Wang responded that he was a U.S.—not Chinese—citizen. *Id.* ¶ 23. They released Wang but kept his computer and passport, telling him that he "would not be going home that day." *Id.* ¶ 24. Over the next three weeks, the same Iranian officials interrogated Wang twice more. *Id.* ¶ 26. Eventually, Wang received a call directing him to a hotel in Northern Tehran, where he "was told that the authorities" thought he "had done nothing wrong" and that he "could go home." *Id.* But despite Wang's request that the Swiss embassy arrange his travel, someone told him that Iranian authorities had to take him to the airport. *Id.*

Instead, those "authorities" took Wang directly to Tehran's Evin prison. Wang Dec. ¶ 27. Things happened "very fast" after his arrival. *Id.* ¶ 29. Wang explained that a magistrate judge announced his arrest for the "false charge[]" of espionage, and guards then took him to a facility within the prison called "Section 209." *Id.* Once there, the guards stripped Wang, placed him in a prison uniform, blindfolded him, and walked him to his solitary-confinement cell. *Id.* ¶¶ 30–31.

Wang's concrete cell was about nine feet by twelve feet and had little in it. *See* Wang Dec.

¶ 31.  Beyond a carpet and sink, Wang had only "three pieces of blanket": one to lie on, one to fold as a pillow, and the other to use as a cover.  *Id.*  The windows were barred and high off the ground.  *Id.*  But day and night, the cell's "light was always on."  *Id.*  Wang spent almost three weeks in solitary confinement, suffering daily panic attacks and losing about 20 pounds in the process.  *Id.* ¶¶ 32–33.  His captors also interrogated him for all but one of those days.  Among other things, they told him that if he was "Chinese, none of this would have happened."  *Id.* ¶ 34.  But Wang "deserve[d] it because" he was "American."  *Id.*  Based on their comments, "it was very clear to" Wang that his interrogators "knew [he] was not really a spy."  *Id.*

Eighteen days into his captivity, Wang was taken to a hotel suite.  Wang Dec. ¶ 36.  His interrogators told him that they did not think he had done anything wrong, so their supervisor could release him if he "leave[s] a good impression."  *Id.* ¶ 35.  At the hotel, an older man told Wang that he needed to answer questions while being recorded—ostensibly to see if Wang was telling the truth.  *Id.* ¶ 36.  Wang realized something was off, though, based on the nature of the questions. *Id.*  Despite "play[ing] along," Wang was re-imprisoned with several Iranian prisoners and then subjected to new interrogators a week later.  *Id.* ¶¶ 36–37.

Those interrogators focused on extracting a confession that Wang was an American spy. *See* Wang Dec. ¶ 38.  Keeping Wang blindfolded "at all times," they told him that he would return to solitary confinement if he did not confess.  *Id.*  More than that, these interrogators explained "that they needed an American prisoner to do a deal with the United States" for Iranian prisoners and assets.  *Id.*  Wang's confession was crucial for that deal, they said, so he would "rot in Iranian prison" if he did not give them what they wanted.  *Id.*  Wang eventually complied and "confess[ed]" to "things [he] did not do."  *Id.* ¶¶ 38–39.  His interrogators had no interest in details. All they cared about was obtaining a one-sentence statement: "I am spy for the United States!"  *Id.*

4

¶ 38.  With that in hand, they never interrogated Wang again.  *Id.*

But Wang's captivity was not over.  About a month after being taken prisoner, his knee became so swollen that he could not bend it.  *See* Wang Dec. ¶ 40.  That meant he could not use the "squat down toilet," and the guards refused to give him a chair that would have helped.  *Id.* Nor did Wang receive any medication for his knee.  *Id.*  This pain came and went until finally improving after Wang saw doctors in 2018, when he was told that "the pain was attributed to [his] incarceration."  *Id.*  Still, Wang suffered from several other health problems.  He experienced "severe back pain" from sleeping on concrete that continues today.  *Id.*  Despite his requests, he was never allowed to see a "real doctor" for a skin problem or a dentist for tooth pain that he endured for years because of a wisdom tooth that needed removal.  *Id.* ¶ 41.  And on top of that, Wang dealt with insomnia, nightmares, and migraines.  *Id.* ¶ 42.  The migraines still plague Wang, as do the stomach aches and digestive problems that began while he was imprisoned.  *Id.*

Wang went to trial in March 2017.  Wang Dec. ¶ 44.  A judge on the Islamic Revolutionary Court found him guilty of espionage and imposed a ten-year sentence—all without the presentation of witness testimony or any other evidence.  *Id.*  Several months later, the "second court" denied Wang's appeal.  *Id.*  With that conviction final, Wang went to Evin's "general prison" and stayed there until his release.  *Id.* ¶ 45.

In December 2019—more than three years after his detention began—Wang was freed as part of a prisoner exchange.  Wang Dec. ¶ 47.  But his time in captivity continues to affect him and his family.  For example, Wang suffers from several physical ailments that began while at Evin, including back pain and headaches.  *Id.*  And although he and Qu had considered having a second child, his detention uprooted their lives and put that plan on hold.  *Id.* ¶ 48.  Qu had to sacrifice career opportunities because she needed "maximum flexibility" to "devote time to" her

husband's case, and Wang's academic pursuits were "completely and permanently derailed." *Id.*
¶¶ 49, 54; *see also* Qu Dec. ¶ 32. On the personal front, Wang came back from Iran "a shell of the
man that Hua married," leading to more "time managing household tensions." Wang Dec. ¶ 50.
Wang's relationship with his mother, Kexu Lan, has suffered too. They spend less time together
and "are often upset with each other," which Wang attributes to her "disappoint[ment]" that he
chose to study in Iran. *Id.* ¶ 52.

### B.    Procedural History

Wang—along with his wife, son, and mother (together, "the Wangs")—sued the Islamic
Republic of Iran in early 2022 for injuries resulting from his detention. *See* ECF No. 1 ("Compl."254).
They allege liability under the Foreign Sovereign Immunities Act, *see* 28 U.S.C. § 1605A, and
New Jersey common law. *See* Compl. ¶¶ 111–52. The Wangs first asked the Clerk of Court to
effect service under 28 U.S.C. § 1608(a)(3), which involves mailing the summons and complaint
to "the head of the ministry of foreign affairs of the foreign state concerned." *See* ECF No. 9. A
month later, they requested that the Clerk of Court proceed under § 1608(a)(4)—under which the
State Department serves process—because service was "not possible" under § 1608(a)(3). ECF
No. 11 ¶ 7. In October 2022, the State Department confirmed that the Iranian Ministry of Foreign
Affairs had received the key documents. *See* ECF No. 16. Iran never answered or otherwise
responded to the complaint, so in August 2023 the Wangs sought—and the Clerk entered—an
entry of default. *See* ECF Nos. 17, 18. About ten months later, they moved for default judgment.
*See* ECF No. 21.

## II.    Legal Standard

The Court may enter a default judgment "when the adversary process has been halted be-
cause of an essentially unresponsive party." *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d
164, 174 (D.D.C. 2019) (citation omitted). Before moving for that relief, plaintiffs must first

obtain an entry of default from the Clerk. *See* Fed. R. Civ. P. 55(a), (b). This non-adversarial posture, however, does not "relieve" the Court "of its affirmative obligation" to assess subject-matter jurisdiction." *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 157 (D.D.C. 2017) (internal quotation marks and citation omitted). And the Court should also "satisfy itself that it has personal jurisdiction" over the absent defendant. *Id.* (citation omitted).

To have a right to default judgment in the FSIA context, a plaintiff must "establish[] his claim or right to relief by evidence satisfactory to the Court." 28 U.S.C. § 1608(e). The Court, then, "may not unquestioningly accept a complaint's unsupported allegations as true." *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012). But it need not "demand more or different evidence than it would ordinarily receive." *Rezaian*, 422 F. Supp. 3d at 175 (citation omitted). Using affidavits and declarations, for example, is one way for FSIA plaintiffs to support their claims. *See, e.g.*, *Reed*, 845 F. Supp. 2d at 212. And the Court has "the authority—indeed," the "obligation—to adjust evidentiary requirements to differing situations." *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 38 (D.D.C. 2019) (cleaned up) (citation omitted). In the end, the Court "must be mindful that Congress enacted" the terrorism exception within the FSIA to "prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016) (quoting *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014)).

## III.    Analysis

As it must, the Court begins by assessing its jurisdiction. With that prerequisite satisfied, the Court then considers whether the Wangs have established that Iran is liable for its actions. And because they have done so, the Court concludes by turning to their request for damages.

**A.      The Court Has Jurisdiction Over the Claims Against Iran**

**1.      Subject-Matter Jurisdiction**

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in a United States court." *Hekmati*, 278 F. Supp. 3d at 157.  Under 28 U.S.C. § 1330(a), district courts have jurisdiction over (1) "any nonjury civil action" (2) "against a foreign state" (3) for "any claim for relief *in personam*," but only if (4) the state is not entitled to immunity.  The first three requirements are met.  A "default judgment proceeding under the FSIA is a nonjury civil action"; "Iran is a foreign state"; and as discussed below, "the court has personal jurisdiction over" Iran as a "legal person[]," so this action is "*in personam*[] rather than in rem." *Reed*, 845 F. Supp. 2d at 210; *see also, e.g.*, *Saberi v. Gov. of Islamic Republic of Iran*, 541 F. Supp. 3d 67, 77 (D.D.C. 2021).

That leaves the immunity question as the remaining jurisdictional hurdle.  Typically, foreign states are "immune from the jurisdiction" of United States courts.  28 U.S.C. § 1604.  The FSIA's terrorism exception, however, nullifies that immunity—and thus unlocks jurisdiction— when the lawsuit seeks "money damages . . . for personal injury or death." *Id.* § 1605A(a)(1).  More precisely, the personal injury or death must have been "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." *Id.*  The act (or provision of support) must also have been "engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency." *Id.*

Each element is present here.  The Wangs seek money damages from Iran, a foreign state. *See* Compl. at 29 (requesting compensatory and punitive damages).  And the family does so to recover for "personal injury" caused by Iran's actions.  § 1605A(a)(1).  The FSIA's causation requirement insists only on a showing of "proximate cause." *Rezaian*, 422 F. Supp. 3d at 177 (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir.

2004)).  In turn, the proximate-cause inquiry asks whether Iran's actions were a "'substantial factor' in the sequence of events" leading to "injury" and whether that injury was "reasonably foreseeable or anticipated as a natural consequence" of those actions.  *Frost*, 383 F. Supp. 3d at 48 (citation omitted).  Iran's conduct—abducting Wang, detaining him in Evin prison for years under brutal conditions, and subjecting him to repeated interrogations—was much more than a "substantial factor" in the Wangs' injuries.  It was *the* reason that Wang endured physical and psychological injuries, and that his family suffered injuries as indirect victims of Iran's treatment of him.  Those injuries were also the foreseeable consequence of Iran's conduct.  In short, "the connections between Iran's alleged actions and [the] injuries are both reasonable and clear: Iranian agents unlawfully detained" Wang for over three years "in Evin Prison for the purpose of increasing its leverage in" a prisoner exchange "with the United States."  *Saberi*, 541 F. Supp. 3d at 78.

Finally, the Wangs must establish that the conduct supporting proximate cause qualifies as one of the FSIA's enumerated predicate acts.  *See* § 1605A(a)(1).  They have done so because Iran caused those injuries by an act of "hostage taking."  *Id.*  The FSIA incorporates the definition of hostage taking set forth in the International Convention Against the Taking of Hostages, *see* § 1605A(h)(2), which defines that term as the seizure or detention of a person where the hostage taker "threatens to kill, to injure, or to continue to detain" the person "to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage."  *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 359 (D.C. Cir. 2006) (citation omitted).  The "essential element" of a "hostage-taking claim" is "some '*quid pro quo*'"— *i.e.*, the hostage's release turns on someone else doing (or not doing) something.  *Id.* (citation omitted).

Because Iran imprisoned Wang precisely so that it could extract concessions from the

United States, the Wangs' injuries result from an act of hostage taking. The "taking" part is self-explanatory; Wang was "abduct[ed]" as he was leaving Iran and detained in Evin prison for more than three years. *Frost*, 383 F. Supp. 3d at 46. And Iran's goal of obtaining "[p]olitical leverage" in its "relationship with the United States is a sufficiently coercive purpose to establish hostage-taking" under the FSIA. *Id.* No doubt Iran had that aim when it abducted Wang and imprisoned him for years. His interrogators told him that an "American prisoner" was the key to making "a deal with the United States" for Iranian prisoners and assets. Wang Dec. ¶ 38. And they said he would "rot in Iranian prison" if he did not facilitate that goal by confessing to espionage. *Id.* In other words, Iran "threatened to . . . extend" his "detention to increase its leverage" with the United States—the hallmark of hostage taking under the FSIA. *Saberi*, 541 F. Supp. 3d at 80. That is no anomaly. As Dr. Matthew Levitt explained, "Iran has a longstanding and official state practice of arbitrarily arresting and detaining . . . foreign citizens and holding them as hostages to . . . extract political, economic, technological, or other benefits from third parties" like "the government of the United States of America."[1] ECF No. 21-3 at 2. True to that practice, Iran released Wang only when "a prisoner exchange" with the United States materialized—and only after "rais[ing] his price as a hostage" by extracting a false confession of espionage. *Hekmati*, 278 F. Supp. 3d at 162; ECF No. 21-3 at 20–21; *see also* Wang Dec. ¶ 47. Wang, by the FSIA's definition and any other, was taken hostage and suffered injuries as a result.

The Wangs also argue that Iran caused the injuries by an act of "torture." § 1605A(a)(1).

---

[1] Dr. Levitt is qualified to provide his opinion as an expert on international terrorism, particularly "Middle East terrorist groups." ECF No. 21-3 at 3. Among other qualifications, he holds a Ph.D. in international relations, served as a counterterrorism analyst at the FBI and as a counterterrorism advisor in the State Department, and now runs the Reinhard Program on Counterterrorism and Intelligence within the Washington Institute for Near East Policy. *Id.* at 3–4. Because of his expertise, Dr. Levitt has "written, taught, lectured, been qualified to provide court testimony, and testified before Congress on Iran's various malign activities." *Id.* at 4.

The FSIA defines that term by reference to the Torture Victim Protection Act of 1991. *See*
§ 1605A(h)(7); *see also, e.g.*, *Hekmati*, 278 F. Supp. 3d at 159. In turn, that act defines "torture"
as:

> [A]ny act, directed against an individual in the offender's custody or physical con-
> trol, by which severe pain or suffering (other than pain or suffering arising only
> from or inherent in, or incidental to, lawful sanctions), whether physical or mental,
> is intentionally inflicted on that individual for such purposes as obtaining from that
> individual or a third person information or a confession, punishing that individual
> for an act that individual or a third person has committed or is suspected of having
> committed, intimidating or coercing that individual or a third person, or for any
> reason based on discrimination of any kind.

Torture Victim Protection Act of 1991, Pub. L. No. 102–256, 106 Stat. 73 (Mar. 12, 1992).
Through its cross-reference, the FSIA also provides that "mental pain or suffering" means "pro-
longed mental harm caused by" one of the following: "the intentional infliction or threatened in-
fliction of *severe* physical pain or suffering"; the use or threatened use of "mind altering substances
or other procedures calculated to disrupt profoundly the sense or the personality"; "the threat of
imminent death"; or the threat that another person "will imminently be subjected" to any of the
above. *Id.* (emphasis added).

Whether Iran tortured Wang is a close call. "[C]ourts in this jurisdiction" have, to be sure,
held that Iran's hostages "were victims of torture." *Hekmati*, 278 F. Supp. 3d at 160–61, 163
(plaintiff held in Iran's Evin prison for over four years suffered injuries because of acts of torture);
*see also Rezaian*, 422 F. Supp. 3d at 172, 177 (same for plaintiff held in Evin prison for almost 18
months). But each case is different, and "torture is a label that is 'usually reserved for extreme,
deliberate and unusually cruel practices'"—for example, "sustained systematic beating," electro-
cuting "sensitive parts of the body, and tying up" captives "in positions that cause extreme pain."
*Saberi*, 541 F. Supp. 3d at 79 (quoting *Price v. Socialist People's Libyan Aram Jamahiriya*, 294
F.3d 82, 95 (D.C. Cir. 2002)).

No doubt, Wang experienced terrible conditions in Evin prison. He was held in solitary confinement for weeks with nothing but a sink, dirty carpet, and three pieces of blanket. Wang Dec. ¶ 31. Making matters worse, his captors kept the lights on all day and night. *Id.* Wang also endured blindfolded interrogations where he was told that he would "rot in Iranian prison"—and return to the solitary confinement that had taken such a toll on him—if he did not falsely confess to being a U.S. spy. *Id.* ¶ 38. And even *after* he did as his captors requested, Wang still suffered from several medical problems resulting from the conditions of his captivity—problems that went untreated or, at best, received inadequate treatment. *Id.* ¶¶ 40–42. Iran thus treated Wang "cruel[ly] and inhumane[ly]." *Saberi*, 541 F. Supp. 3d at 79. But because "the uncontroverted evidence establishes that Iran committed an act of hostage taking," the Court need not decide whether that conduct was "severe" enough "to constitute 'torture' under the FSIA." *Id.* The hostage taking pierces sovereign immunity and unlocks jurisdiction.

Not only does the Court have subject-matter jurisdiction, but "it must exercise" it. *Saberi*, 541 F. Supp. 3d at 80. Under § 1605A(a)(2), the Court "shall hear a claim under this section" when: (1) the foreign state carried a state-sponsor-of-terrorism designation when the act happened and when the plaintiff filed suit; (2) "the claimant or the victim was" a U.S. national when the act occurred; and (3) if the act happened in the foreign state being sued, the claimant has given that state "a reasonable opportunity to arbitrate the claim." All three conditions are met here.

First, the State Department has continuously designated Iran as a state sponsor of terrorism since 1984. *See* U.S. Department of State, *State Sponsors of Terrorism*, https://perma.cc/MNV3-DWP5 (last visited March 12, 2025); *see also, e.g.*, *Saberi*, 541 F. Supp. 3d at 80. Second, Wang became a naturalized U.S. citizen in 2009, long before Iran detained him. Wang Dec. ¶¶ 2–3. So

as "the victim," Wang "is—and was at the time of his captivity—a U.S. national."[2]  *Abedi-nigalangashy v. Gov. of the Islamic Republic of Iran*, No. 23-cv-1105 (JEB), 2024 WL 4227133, at *4 (D.D.C. Sept. 18, 2024).  True, Wang's wife Qu was not a U.S. citizen during his detention.  But the FSIA provides that "'a claim' under section 1605A will be heard if *either* 'the claimant *or the victim*' was a United States national at the time of the act," so Wang's citizenship is enough.  *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 167–68 (D.D.C. 2016) (quoting § 1605A(a)(2)(A)(ii)); *see also, e.g.*, *Przewozman v. Islamic Republic of Iran*, No. 19-cv-2601 (RDM), 2024 WL 5263844, at *11 (D.D.C. Aug. 14, 2024).  And third, the Wangs included an arbitration request in the "Notice of Suit" that the State Department delivered to Iran along with the summons and complaint.  *See* ECF No. 16; *see also* ECF No. 15 (mailing "notice of suit" to Department of State for effecting service); ECF No. 21-1 at 11.  That is enough; the offer to arbitrate "need not precede the complaint" but may "accompan[y] the service package."  *Doe v. Democratic People's Republic of Korea Ministry of Foreign Affairs Jungsong-Dong*, 414 F. Supp. 3d 109, 125 (D.D.C. 2019).

The Court thus has—and must exercise—subject-matter jurisdiction over the Wangs' claims.

### 2.    Personal Jurisdiction

The Court has personal jurisdiction over Iran if it has subject-matter jurisdiction over the claims and Iran was properly served.  *See* 28 U.S.C. § 1330(b).  As explained above, the Court has subject-matter jurisdiction.  And as detailed below, the Wangs properly served Iran through the State Department.

---

[2] The FSIA gives the phrase "national of the United States" the same meaning as 8 U.S.C. § 1101(a)(22) does.  *See* 28 U.S.C. § 1605A(h)(5).  In turn, § 1101(a)(22) provides that "a citizen of the United States" is a U.S. national.

The FSIA provides four ways to serve a foreign state. *See* 28 U.S.C. § 1608(a). The first two options are unavailable because Iran and the United States have no "special arrangement for service," *see id.* § 1608(a)(1), and because Iran is not party to an "applicable international convention on service," *see id.* § 1608(a)(2). Method three entails asking the Clerk of Court to "send[] a copy of the summons and complaint and a notice of suit," with translations of each, "to the head of the ministry of foreign affairs" of Iran. *Id.* § 1608(a)(3). And the last resort is requesting that the Clerk send two copies of those materials to the State Department so that "service can be effected through diplomatic channels." *Saberi*, 541 F. Supp. 3d at 81 (citing § 1608(a)(4)).

The Wangs tried option three in April 2022, but that did not work. *See* ECF Nos. 9, 11–12. A month later, the family requested service under the fourth method. The State Department confirmed in October 2022 that the service documents had been "deliver[ed] to the Iranian Ministry of Foreign Affairs" in late September. ECF No. 16 at 1. The Wangs thus "satisfie[d] § 1608(a)(4)," which establishes personal jurisdiction because there is "no need to conduct a minimum contacts analysis" when the defendant is a "foreign state[]." *Saberi*, 541 F. Supp. 3d at 81 (citation omitted).

### B.    Iran Is Liable to the Wangs

#### 1.    Wang, Lan, and S.Q.

U.S. citizens "may rely on the cause of action" in the FSIA's "terrorism exception to establish Iran's liability for their injuries." *Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 176 (D.D.C. 2020). The Wangs argue that three of them were U.S. citizens at the time of Iran's actions and thus qualify: Wang, his mother Kexu Lan, and his son S.Q. Wang became a naturalized citizen in January 2009, *see* Wang Dec. ¶ 3, just months after his mother did in late 2008, *see* ECF No. 21-7 ¶ 3; *id.* at 9. S.Q. was born in China but "registered as a United States citizen born abroad." Wang Dec. ¶ 4; *see also* ECF No. 21-2 at 19; ECF No. 23-2 ¶ 4. The record

does not show precisely when S.Q. obtained that status.  But even if it were as late as when he received his passport in early 2018, Wang was still detained then—and still taken as a hostage under the FSIA.  *See* ECF No. 21-2 at 19.  The Wangs acknowledge, though, that Qu "was not a U.S. national" until 2022.  ECF No. 21-1 at 25; *see also* Qu Dec. ¶ 3.  So the family contends that while she has no cause of action under § 1605A, she may pursue "a common law cause of action for her injuries."  ECF No. 21-1 at 25.  Thus, the Court assesses Iran's liability to Wang, Lan, and S.Q. before turning to Qu.

Courts have taken two approaches when assessing a foreign state's liability to plaintiffs bringing claims under the FSIA's cause of action.  The first reasons that the immunity-waiver inquiry and liability question are conceptually distinct but functionally overlapping.  That is, a plaintiff who "establish[es] a waiver of foreign sovereign immunity under § 1605(a)" also "establish[es] entitlement to relief as a matter of federal law."  *Levinson*, 443 F. Supp. 3d at 176.  "Essentially," then, "liability under § 1605A(c) will exist whenever the jurisdictional requirements" are met.  *Hekmati*, 278 F. Supp. 3d at 163.  So under this analysis, Wang, Lan, and S.Q. have established that Iran is liable for the personal injuries that they suffered because of Iran's act of hostage taking.  *E.g.*, *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010).

The result is the same under the second approach.  On this view, § 1605A(c) creates a private right of action but "provides no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages."  *Rezaian*, 422 F. Supp. 3d at 178.  So a FSIA plaintiff must still "prove a theory of liability found in well-established principles of law, such as those found in the Restatement (Second) of Torts."  *Saberi*, 541 F. Supp. 3d at 81 (citation omitted).  The Wangs do not spell out these theories in their motion.  But for all the reasons that the record supports the

finding that Iran engaged in hostage taking, it also shows that Iran is liable under four recognized theories of liability.

Three apply only to Wang himself.  To begin, false imprisonment occurs when (1) a defendant "acts intending to confine [the victim] . . . within boundaries fixed by the actor"; (2) the "act directly or indirectly results in such a confinement of the" victim; and (3) the victim "is conscious of the confinement or harmed by it."  *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 342–43 (D.D.C. 2016) (quoting Restatement (Second) of Torts § 35).  "Holding an innocent person hostage satisfies all of these elements."  *Rezaian*, 422 F. Supp. 3d at 179.  Indeed, it is hard to think of a clearer example of false imprisonment than what Iran did to Wang: abducting him on "false charges," detaining him in brutal conditions, and "forc[ing]" him to confess to "things [he] did not do" just to gain leverage for a prisoner exchange.  Wang Dec. ¶¶ 5, 39.

So too for battery, which "requires an act 'intending to cause a harmful or offensive contact with'" another so long as "offensive contact in fact 'directly or indirectly results.'"  *Saberi*, 541 F. Supp. 3d at 82 (quoting Restatement (Second) of Torts § 18).  Wang explained that Iranian authorities took him to Evin prison, "stripped [him] down," Wang Dec. ¶¶ 27–30, and "repeatedly moved [him] around the prison—each time against [his] will," *Saberi*, 541 F. Supp. 3d at 82.  Those contacts were offensive—and thus acts of assault—because they "offend[] a reasonable sense of personal dignity."  Restatement (Second) of Torts § 19; *see also Rezaian*, 422 F. Supp. 3d at 178–79 (Iran liable on assault theory for "forcibly arrest[ing] [the victim] and repeatedly mov[ing] him around Evin Prison").

For mostly the same reasons, assault provides another theory of liability for Wang.  Assault occurs when someone "acts intending to cause a harmful or offensive contact with the person of the other"—or to cause an "imminent apprehension of such a contact"—and the other person "is

thereby put in such imminent apprehension."  Restatement (Second) of Torts § 21.  Wang's time in solitary confinement caused him physical and mental suffering, and his interrogators "threatened" to put him "back [in] solitary confinement" if he did not falsely confess to espionage.  Wang Dec. ¶ 38.  In other words, Wang's captors threatened him with an offensive and harmful contact— *moving* him back to solitary confinement—that caused Wang imminent apprehension that they would do just that.  Given that he had previously endured almost three weeks in solitary confinement, Wang "believed" that the interrogators would "follow through on their threats," as shown by his eventual confession to avoid that fate.  *Rezaian*, 422 F. Supp. 3d at 178.

Finally, Wang, Lan, and S.Q. endured the intentional infliction of emotional distress, so that theory supports liability too.[3]  This liability theory requires proof that Iran, "by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to each of them."  *Rezaian*, 422 F. Supp. 3d at 179 (cleaned up) (citation omitted).  Because Lan and S.Q. "were not the direct recipient[s] of the 'extreme and outrageous conduct'"— the multi-year detention of Wang—they must show that they are "members of" Wang's "immediate family."  *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 81 (D.D.C. 2017).  And as claimants who were not "present at the time" of that conduct, they must also show that Iran's actions were "sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present."  *Id.* (quoting *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26–27 (D.D.C. 2009)).  Hostage cases, after all, "implicitly involve a physical separation of the plaintiff from the victim."  *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 (D.D.C. 2001).  And because the "plaintiff's

---

[3] In the complaint, the Wangs allege "intentional infliction of emotional distress" on behalf of "all Plaintiffs" under New Jersey law.  Compl. at 26.  The motion for default judgment seems to focus this claim on Qu.  *See* ECF No. 21-1 at 24–29.  In any event, the record supports the liability theory that Iran intentionally inflicted emotional distress.  So Wang, Lan, and S.Q. have supported their FSIA causes of action with that theory.

lack of presence is the *exact source* of his emotional distress," permitting recovery for non-present plaintiffs makes sense if they show sufficiently outrageous conduct. *Id.*

Wang has easily established these elements as the direct victim of Iran's actions. The record establishes that Iran intentionally detained him, subjected him to solitary confinement and repeated interrogations to obtain a false confession of espionage, and failed to provide (among other things) adequate medical care. By any measure, that conduct is "extreme and reckless." And because of Iran's actions, Wang "suffered . . . from severe emotional distress." *Saberi*, 541 F. Supp. 3d at 82. To take just some examples, he endured "panic attacks several times a day," "obsessed over the likelihood that [he] would be abused and die," and suffered from "insomnia and nightmares" given the "extreme psychological pressure." Wang Dec. ¶¶ 32, 42; *see also* ECF No. 23-2 at 21 (psychological treatment summary). So this theory is yet another supporting Iran's liability to Wang.

The theory of intentional infliction of emotional distress also establishes Iran's liability to Lan and S.Q.[4] Both are immediate family members as Wang's "parent[]" and "child[]." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010). "[H]ostage taking and torture," moreover, are "sufficiently outrageous to inflict severe emotional harm on family members who were not present" for the acts. *Rezaian*, 422 F. Supp. 3d at 179; *see also Kar v. Islamic Republic of Iran*, Nos. 19-cv-2070, 19-cv-2602 (JDB), 2022 WL 4598671, at *17 (D.D.C. Sep. 30, 2022). Although Wang's treatment might not qualify as torture under the FSIA, Iran behaved outrageously enough to cause extreme emotional distress by holding Wang hostage for over three years

---

[4] The Wangs assert that Lan and S.Q. are entitled to compensatory damages "for their Solatium claims." ECF No. 21-1 at 33–36. Under the FSIA, such claims "are indistinguishable from claims of intentional infliction of emotional distress." *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 63 (D.D.C. 2021).

in horrific conditions.  And finally, both Lan and S.Q. did suffer severe emotional distress because of what Iran did to Wang.  Lan felt "helpless" during Wang's captivity and spent "every day and every minute worrying about him."  ECF No. 21-7 ¶¶ 10–11.  And since his release, she suffers from a "huge sleeping problem," constantly has "images in" her "mind of what" she "imagine[s]" her son "went through in Iran," has visited "hospital emergency rooms and various doctors," and sees "a therapist every week" because of this trauma.  *Id.* ¶¶ 12, 16; *see also* ECF No. 23-7 at 11, 18, 21 (behavioral health care report).

As for S.Q., his mother explained that he understandably has "been deeply affected by his father's ordeal."  Qu Dec. ¶ 39.  For example, he drew "prison and warrior themed" pictures in therapy while Iran held his father captive.  *Id.* ¶ 36.  And teachers have reported that S.Q. "feel[s] angry and asks" his peers "to stop" talking about his father's captivity when it comes up "at lunch." *Id.* ¶ 39.  The Court recognizes that the emotional distress must be "extreme," and perhaps the testimony about S.Q.'s mental state is, in a vacuum, light on this point.  *See* Restatement (Second) of Torts § 46.  But in this situation—that is, a young child who lost over three years with his father while a foreign state held him hostage in a notoriously brutal prison—the record supports a finding that S.Q., like his grandmother, suffered severe emotional distress.

In sum, Wang, Lan, and S.Q. have established Iran's liability to them under both approaches.

### 2.    Qu

The Wangs contend that Qu is entitled to damages for Iran's intentional infliction of emotional distress.  As mentioned, the family does not argue that Iran is liable to Qu under the FSIA's cause of action, even though the complaint includes her in a "loss of solatium" claim under § 1605A(c).  *See* Compl. at 25–26.  Qu became a U.S. national only after Wang's captivity ended, so the family reasons that she is not eligible for the statutory cause of action.  ECF No. 21-1 at 25.

That is not clear.  The FSIA provides a "[p]rivate right of action" to "national[s] of the United States" for personal injury or death caused by, among other things, torture or hostage taking. § 1605A(c)(1).  This provision is silent on timing—*i.e.*, whether the U.S. national obtained that status before the foreign state's qualifying acts.  It thus differs from another FSIA provision explaining that courts "*shall* hear a claim" in certain conditions; for that provision to apply, the "claimant or the victim" must have been a U.S. national "at the time the" qualifying "act" occurred. § 1605A(a)(2)(A)(ii)(I) (emphasis added).  But as explained, Qu's citizenship "is non-consequential for jurisdictional purposes" because Wang's citizenship as the victim clears that hurdle. *Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-2065 (JDB), 2023 WL 3496303, at *6 (D.D.C. May 16, 2023) (cleaned up) (citation omitted).  And the FSIA's cause of action "is open to plaintiffs who are U.S. nationals."  *Opati v. Republic of Sudan*, 590 U.S. 418, 422 (2020).

In any event, "once a foreign state is not entitled to immunity under" § 1605A, "plaintiffs may bring state law claims that they could have brought if the defendant were a private individual." *Henkin v. Islamic Republic of Iran*, Nos. 18-cv-1273, 19-cv-1184 (RCL), 2021 WL 2914036, at *5 (D.D.C. July 12, 2021) (quoting *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009)).  Because Qu has chosen to do that here and does not try to double recover under state law and the FSIA, the Court will address her state-law claim.

Before doing so, it must decide what law governs.  The forum state's choice-of-law rules guide that inquiry, so the Court applies those of the District of Columbia: a combination of a "governmental interests analysis" with a "most significant relationship" test.  *Est. of Fouty v. Syrian Arab Republic*, 743 F. Supp. 3d 118, 165 (D.D.C. 2024) (citation omitted).  The former considers the "governmental policies underlying the applicable laws" and determines "which jurisdiction's policy would be most advanced by having its law applied."  *Id.* (citation omitted).  And the latter

balances four factors: (1) the location of the injury; (2) the location of the injury-causing conduct; (3) the geographic characteristics of the parties, such as residency, nationality, and place of domicile; and (4) the geographic center of the parties' relationship (if they have one). *See id.*  The Restatement (Second) of Conflict of Laws—the source of these factors—also accounts for, among other things, "certainty, predictability, uniformity of result, and ease" of determining and applying the governing law.  *Est. of John Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 21 (D.D.C. 2011) (citation omitted).

 The Wangs pit New Jersey law against District of Columbia law and argue that the former should apply.  There is of course a third forum's law that might govern: that of Iran, where the injury-causing conduct occurred.  But in this case, the "United States has a unique interest in having its domestic law—rather than the law of a foreign nation—used."  *Est. of John Doe*, 808 F. Supp. 2d at 22 (citation omitted).  For one thing, Wang "is a United States citizen" whose "hostage-taking was . . . meant to"—and did—"force" a prisoner exchange "by the United States government."  *Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53, 65 (D.D.C. 2006).  For another, Qu "seeks recovery for intentional infliction of emotional distress"—an injury that she "suffered in the United States."  *Id.*  And more broadly, the FSIA's goal of deterring "outlaw states" from behavior like Iran's points towards domestic rather than Iranian law in this lawsuit premised on a "state-sponsored terrorist attack on" a U.S. "citizen[]," "particularly" because the "attack [was] directed against" the U.S.'s "national interests."  *Id.*

 The real question, then, is whether the law of the forum or of Qu's domicile applies.  The Wangs seem to press for the latter, *see* ECF No. 21-1 at 25, but also suggest that the Court should "blend District of Columbia law and New Jersey law," *see id.* at 26.  The Court will not create a New Jersey-D.C. hybrid law; the District's "constructive blending" of two choice-of-law *analyses*

does not mean that courts blend the *substantive law* of different states. *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 154 (D.D.C. 2011) (citation omitted).

The threshold question is whether D.C. law "conflict[s]" with New Jersey law on this tort. *Owens*, 826 F. Supp. 2d at 154. Although courts in these jurisdictions might differ in how they describe intentional infliction of emotional distress, the basic elements are the same in each: (1) extreme and outrageous conduct by the defendant that (2) intentionally or recklessly (3) causes severe emotional distress. *Compare Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 85 (D.D.C. 2006), *with Segal v. Lynch*, 993 A.2d 1229, 1241–42 (N.J. Super. 2010). Courts had construed D.C. law, at least in terrorism cases, to require neither "physical injury" nor "presence" for a plaintiff to recover under this theory. *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 57 (D.D.C. 2008); *see also Bodoff*, 424 F. Supp. 2d at 85–86; *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 156 (D.D.C. 2009). And the D.C. Court of Appeals has since confirmed that "presence at the scene is not required" in "case[s] where the defendant is a state sponsor of terrorism denied sovereign immunity by the FSIA." *Republic of Sudan v. Owens*, 194 A.3d 38, 42 (D.C. 2018). New Jersey, for its part, does not seem to require proof of "any physical injury." *Lacy v. Cooper Hosp./Univ. Med. Ctr.*, 745 F. Supp. 1029, 1035 (D.N.J. 1990) (citing *Hume v. Bayer*, 428 A.2d 966, 970 (N.J. Super. 1981)). But as the Wangs acknowledge, that state's courts do not appear to have "specifically addressed whether a plaintiff's presence is required to establish a viable [intentional infliction of emotional distress] claim." *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 43 (D.D.C. 2007). This potential divergence means that the Court must assess the "government interests analysis" and "most significant relationship test." *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 47 (D.D.C. 2020).

Because the first points to the District's law and the second is a mixed bag, the Court will apply D.C. law. The "policy interest in 'uniformity of result' makes . . . D.C. law" appropriate because applying that law subjects "individual plaintiffs domiciled in different states and foreign nations" to "the same substantive law." *Barry*, 437 F. Supp. 3d at 49 (citation omitted). "[B]efore Congress's 2008 amendments to the FSIA," courts "often applied the law of individual plaintiffs' domiciles." *Id.* But those amendments "were directed, in part, to correct" a "disparity": different "state laws" pointed in different directions for "the recovery of emotional distress by immediate family members." *Id.* Because "applying D.C. law" advances "this goal" of "mak[ing] FSIA damages more consistent," the government-interest analysis favors that law. *Abedini v. Gov. of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 134 (D.D.C. 2019); *see also Barry*, 437 F. Supp. 3d at 49 (same); *Est. of Doe*, 808 F. Supp. 2d at 23 (same); *Est. of Fouty*, 743 F. Supp. 3d at 166–67 (same).

Advancing that policy cannot override another state's "significantly greater interest" in having its law apply, but the most-significant-relationship test shows that this is not such a case. *Est. of Doe*, 808 F. Supp. at 23 (citation omitted). Instead, this part of the choice-of-law inquiry "is less clear-cut." *Barry*, 437 F. Supp. 3d at 49. Qu lived in New Jersey during Wang's captivity and suffered the injury there, so the first factor favors that state's law. The second—the location of the injury-causing conduct—points to Iranian law. The third, which considers the parties' domicile, residence, and nationality, is all over the map: Qu was born in China, became a U.S. citizen after Wang's release, lived in New Jersey during his captivity, and has since moved to Maryland. ECF No. 21-6 at 3. And the fourth factor's consideration of the center of the parties' relationship "does not clearly favor any particular jurisdiction." *Est. of Fouty*, 743 F. Supp. 3d at 166.

Against that backdrop, D.C. law applies. "When an injury is of this nature—caused by" Iran's "distant conduct" in detaining and holding Wang hostage—"and where the tortious conduct spanned" over "three years," "certainty, predictability, and uniformity of result" guide the Court. *Abedini*, 422 F. Supp. 3d at 135. The Restatement contemplates that these considerations matter, and it makes sense to turn to them in close cases like this one. *See Est. of Doe*, 808 F. Supp. 2d at 21. So although the District's choice-of-law rules do not uniformly point one way, the Court finds that balancing the governmental-interests analysis with the significant-relationship test leads to the forum state's law rather than New Jersey's.

"D.C. law and that of the Restatement" are "similar[]" when it comes to the tort of intentional infliction of emotional distress. *Est. of Fouty*, 743 F. Supp. 3d at 166 (citation omitted). For "family members of victims injured by tortious conduct, D.C law imposes liability when the defendant": (1) "engaged in extreme and outrageous conduct" that (2) "was directed at persons other than plaintiffs" and that (3) "intentionally or recklessly caused severe emotional distress, but not necessarily bodily harm" (4) to those victims' "immediate family members." *Abedini*, 422 F. Supp. 3d at 135 (citation omitted). Typically, the family member must have been "present at the time such conduct occurred." *Id.* (citation omitted). But as explained, that "presence requirement does not apply to family members of hostages." *Id.* at 136.

Iran is liable to Qu under District of Columbia law for intentional infliction of emotional distress. As explained above, "acts of terror"—such as Iran's acts of "hostage" taking—are "inherently 'extreme and outrageous.'" *Abedini*, 422 F. Supp. 3d at 135 (citation omitted). And Iran directed that conduct at Wang, Qu's "spouse" and "immediate family," so the second and fourth elements are also satisfied. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 79 (D.D.C. 2010). The third is too because Iran's intentional acts in holding Wang captive caused Qu to suffer

severe emotional distress. Qu was "terrified about what might be happening" to her husband in

Evin prison. Qu Dec. ¶ 29. When Wang's captives let him call "once every week or two," Qu

learned "horrifying information about his living conditions" and "how he was being treated." *Id.*

¶ 30. She "feared him dying" in Iran, whether because of those conditions or because Wang "said

he would kill himself" "[o]nce or twice." *Id.* ¶ 31. Understandably, Qu felt "overwhelmed with

anxiety," "hopeless," and "very desperate." *Id.* ¶¶ 34–35. Still, she tried to keep these feelings in

check for her son, often waiting to "cr[y] only after" S.Q. "fell asleep." *Id.* ¶ 42. Neither therapy

nor medication helped. *Id.* ¶ 40. And Iran intentionally caused this distress. By "tak[ing] someone

hostage," Iran "implicitly intend[ed] to cause emotional distress among the members of that hos-

tage's immediate family." *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 50 (D.D.C.

2001); *see also Abedini*, 422 F. Supp. 3d at 135–36. "At the very least," Iran "acted in callous

disregard of the obvious risk that such emotional distress would result" from detaining Wang for

over three years. *Abedini*, 422 F. Supp. 3d at 136 (citation omitted).[5]

---

[5] Before moving to damages, the Court pauses to consider one wrinkle: if Qu is eligible for the FSIA's cause of action, does the FSIA bar her from relying on state law? Some courts have reasoned that Congress's provision of a "specific source of law for recovery" in § 1605A(c) means that "state law no longer controls the nature of the liability" of a foreign state. *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 65–66 (D.D.C. 2008) (internal quotation marks and citation omitted); *see also Reed*, 845 F. Supp. 2d at 215. Those cases cannot stand for the rule that state law is *never* relevant under the FSIA; "foreign national family members," after all, may "pursue claims under applicable state or foreign law" once sovereign immunity is waived. *Est. of Fouty*, 743 F. Supp. 3d at 156 (cleaned up) (citation omitted). But perhaps pursuing state-law theories of recovery is permissible only for plaintiffs who "are not entitled to recover under the § 1605A(c) private right of action"—*i.e.*, for those who *cannot* invoke that cause of action, not merely those who *choose* not to despite being eligible. *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 371 (D.D.C. 2020). That result, though, might be in tension with other courts' recognition that Congress did not, by "provid[ing] for a new, federal cause of action," "intend[] to eliminate claim-ants' ability to assert *other*, non-federal causes of action[] so long as sovereign immunity had been waived." *Flanagan*, 190 F. Supp. 3d at 169; *see also Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 89 (D.D.C. 2018).

### C.    The Wangs Are Entitled to Damages

The FSIA provides for "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4). The Wangs seek compensatory damages covering the first three of those categories, though the claims differ in some ways depending on the family member. And all ask for punitive damages to punish Iran and deter it from doing to others what it did to Wang. The Wangs are entitled to these damages, but not always in the amount they request.

#### 1.    Compensatory Damages

The Wangs seek compensatory damages for pain and suffering, solatium, and economic loss. To obtain these damages under the FSIA, the family "must prove that the consequences of" Iran's "acts were reasonably certain to occur, and they must prove the amount of damages by a reasonable estimate." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 69 (D.D.C. 2015) (citation omitted).

Wang begins by requesting damages for his pre- and post-release pain and suffering. ECF No. 21-1 at 23–24. For his time in captivity, he seeks $12,160,000. *Id.* at 23. And for the enduring

---

The Court need not resolve this issue. Even if Qu is eligible under the FSIA, and even if she could not press a state-law liability theory for that reason, she would be entitled to relief under the FSIA's cause of action. The Wangs pleaded such a claim on Qu's behalf even though they did not argue it in their motion, *see* Compl. at 25, and Qu's "state law claim[]"—even if "based on an improper source of law"—"articulate[s]" a "theor[y] of recovery." *Beer v. Islamic Republic of Iran*, No. 08-cv-1807 (RCL), 2010 WL 5105174, at *9 (D.D.C. Dec. 9, 2010). So the Court "draw[s] upon" the "allegations" supporting her "state law claim[]" and holds that Qu—assuming that she may bring a FSIA claim and that such eligibility bars her state-law claims—has established Iran's liability under § 1605A(c). *Id.* Under the first approach to FSIA liability, the waiver of sovereign immunity establishes Iran's liability to Wang. *See, e.g.*, *Levinson*, 443 F. Supp. 3d at 176. And under the second approach, Qu has established a recognized theory of liability: intentional infliction of emotional distress. As mentioned, "D.C. law and that of the Restatement" are "similar[]" on this front. *Est. of Fouty*, 743 F. Supp. 3d at 166 (citation omitted). So for all the reasons Qu established Iran's liability under D.C. law, she has done the same under the FSIA's cause of action: Iran intentionally or recklessly caused her severe emotional distress by engaging in extreme and outrageous conduct. *See Rezaian*, 422 F. Supp. 3d at 179.

trauma that persists after his release, he asks for $10,000,000. *Id.* at 23–24. Iran's actions were, as discussed above, "'reasonably certain' to injure" Wang. *Abedini*, 422 F. Supp. 3d at 136. So the question is whether the amounts he requests are reasonable estimates.

They are. Wang has thoroughly explained the mental and physical suffering that he endured because Iran detained him in horrific conditions to gain leverage over the United States. "In hostage-taking cases, this district applies a per-diem formula" that awards "$10,000 per day of captivity" to "compensate for injuries sustained while imprisoned." *Abedini*, 422 F. Supp. 3d at 136–37 (collecting cases). Iran held Wang captive for 1,216 days between August 7, 2016 and December 7, 2019. *See* Wang Dec. ¶¶ 5, 47; ECF No. 21-3 at 2. Seeing no reason to deviate from the per-diem method, the Court will award Wang $12,160,000 for his pre-release pain and suffering.

Wang also requests $10,000,000 for his post-release pain and suffering. ECF No. 21-1 at 23–24. On "this delicate terrain," "awards granted to similarly situated plaintiffs in FSIA lawsuits help guide the Court." *Abedini*, 422 F. Supp. 3d at 137. And two factors speak "directly" the "magnitude of a victim's likely post-release pain and suffering": the extent of his "long-term injuries" (the degree of suffering) and his "age at the time of release" (how long he will endure it). *Hekmati*, 278 F. Supp. 3d at 164. In seeking $10,000,000, Wang points to two hostage cases awarding that amount: *Hekmati* and *Rezaian*.

Those cases bear some semblance to Wang's, but the extent of his long-term injuries differs in a few ways that point to a lower award. The age factor is similar across all three cases. Iran released Wang just shy of his 39th birthday—right around the age of the victim in *Rezaian* and about seven years older than the victim in *Hekmati*. ECF No. 21-1 at 24; ECF No. 23-2 at 17; *Rezaian*, 422 F. Supp. 3d at 180; *Hekmati*, 278 F. Supp. 3d at 164. So Wang, like those victims,

is projected to have decades to live with the lingering pain and suffering from his detention.

But while the Court does not doubt that Wang's imprisonment continues to take a toll on him physically and mentally, his evidence of long-term suffering is somewhat thin compared to other cases. Hekmati, for example, established "severe" injuries that were "likely to persist." *Hekmati*, 278 F. Supp. 3d at 164. Although the precise diagnoses by Hekmati's psychiatrist are redacted for privacy reasons, Judge Huvelle would not have described the injuries as she did without evidence of serious ongoing problems. *See id.* at 155. Hekmati also suffered from "recurring lung and sinus infections," "constant intestinal problems," and "a head injury" while imprisoned—all of which could lead to significant lingering post-release pain and suffering. *Id.* at 153–54. And because he was about seven years younger than Wang when released, Hekmati is likely to endure that suffering for longer. Rezaian, for his part, suffered from "long-term psychological effects" and a "number of physical afflictions caused by his detention." *Rezaian*, 422 F. Supp. 3d at 180. He "developed pulmonary and respiratory issues that . . . never . . . abated." *Id.* at 171. On top of those conditions, Rezaian has "breathing problems," "back problems," "psoriasis," "severe anxiety associated with travel," insomnia, and potential fertility problems. *Id.* at 172–73.

To be sure, Wang continues to suffer because of how Iran treated him. His back pain is "improved" but still "plagues him," as do digestive issues. Wang Dec. ¶¶ 40, 42. Although his insomnia is better, he still experiences migraines. *See id.* ¶ 42. Wang also participated in therapy for his mental health. Within about ten months, he received a "prognosis" of "good" after meeting "collaborative treatment goals" and "did not feel he needed further services." ECF No. 21-2 at 21. Again, none of this is to downplay the pain and suffering that Wang continues to experience. But the evidence before the Court does not support the $10,000,000 awards from *Hekmati* and *Rezaian*. Instead, the Court finds that an award of $7,500,000 is appropriate for Wang's post-release pain

and suffering.  Together, then, he is entitled to $19,660,000 for his pain and suffering.

Wang's wife, mother, and son also request damages for their emotional distress.  Such "solatium" damages try compensate for "the mental anguish, bereavement[,] and grief that those with a close personal relationship" to the victim "experience," as well as the harm resulting from the loss of the victim's "society and comfort."  *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (citation omitted).  Claims for solatium damages are "indistinguishable from" claims for intentional infliction of emotional distress.  *Murphy*, 740 F. Supp. 2d at 75 n.4 (citation omitted).  So a plaintiff like Qu proceeding under D.C. law for intentional infliction of emotional distress—rather than under the FSIA's cause of action—may also "recover these damages."  *Abedini*, 422 F. Supp. 3d at 139.

"[Q]uantify[ing] the distress that results when a loved one is taken away" is "undeniabl[y]" challenging.  *Reed*, 845 F. Supp. 2d at 213.  Courts in this District, however, typically follow the "framework . . . established in *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006)."  *Abedini*, 422 F. Supp. 3d at 130.  For terrorism cases "[w]here the victim does not die, but instead suffers only injury," the following benchmarks apply: spouses receive $4 million, while children and parents receive $2.5 million each.  *Moradi*, 77 F. Supp. 3d at 72 (citation omitted); *Reed*, 845 F. Supp. 3d at 214.  With "no reason to part from this line of authority," the Court will use these figures as baselines for solatium damages.  *Abedini*, 422 F. Supp. 3d at 140 (applying framework to claim for solatium damages based on state law rather than the FSIA's cause of action).

Acknowledging the *Heiser* baseline, the Wangs argue that aggravating circumstances warrant upward departures for Qu, Lan, and S.Q.  *See* ECF No. 21-1 at 32–33, 36.  That request requires the Court to consider "whether family members had an 'extraordinarily close relationship'

to the victim"; whether their "emotional trauma was particularly severe"; and whether Iran's actions "made the" family's "suffering particularly agonizing." *Abedini*, 422 F. Supp. 3d at 140 (citation omitted). The Wangs do not engage with these factors directly or specify an enhancement amount; instead, the family asserts without elaboration that Qu, Lan, and S.Q. "had increased emotional distress" because of Wang's imprisonment. ECF No. 21-1 at 33, 36. But this is not a case, for example, in which Iran "surveilled" family members and "interrogated" them "about [their] efforts to free" the victim. *Rezaian*, 422 F. Supp. 3d at 181. Nor did the family members lack information about Wang's "whereabouts throughout his confinement," *Abedini*, 422 F. Supp. 3d at 140 (no enhancement for victim's sister despite "suffer[ing] severe paranoia"), or require hospitalization for "nervous breakdowns" from which they "never fully recovered," *Valore*, 700 F. Supp. 2d at 86.

In short, the *Heiser* framework presumes that Qu, Lan, and S.Q. have close relationships with Wang as his wife, mother, and child. And it assumes that they all endured significant emotional suffering because of what Iran did to him. But the family offers no basis for finding a "*particularly* close connection" with Wang—*i.e.*, that Qu has an especially close relationship with him, beyond the typical close bond that spouses share. *Oveissi*, 768 F. Supp. 2d at 28. Nor have the family members explained how this hostage-taking case differs from others for which *Heiser* supplies the baseline, or how they suffered especially acute trauma compared to other families of hostage victims. So the Court will award solatium damages of $4 million to Qu, $2.5 million to Lan, and $2.5 million to S.Q.

Wang and Qu also seek economic damages. "[L]ost earnings—past and future—are compensable economic damages." *Hekmati*, 278 F. Supp. 3d at 164 (citation omitted). A forensic economist's report "may provide a reasonable basis for determining the amount of economic

30

damages," but the Court should account for "the reasonableness and foundation of the assumptions" that the expert relies on. *Abedini*, 422 F. Supp. 3d at 138 (citation omitted). Qu, as the "victim's family member[]," may recover these damages too. *Id.* at 139. And the standard for assessing her lost earnings "mirrors that used for" Wang. *Id.* Both Wang and Qu obtained lost-earnings reports from Chad Staller's Center for Forensic Economic Studies. *See* ECF No. 21-4 at 2; ECF No. 21-6 at 2. As explained below, both reports rely on reasonable assumptions and thus provide adequate bases for awarding economic damages.

Wang's lost earnings flow from his inability to complete his Ph.D. program after his captivity. As Wang explained, he could not "continue academic study as if nothing ha[d] happened." Wang Dec. ¶ 58. The severe trauma he experienced "derailed" his dream of becoming of a professor; he "lost" his "research project," could not pursue "extended field research," and experienced a fractured relationship with Princeton and his "advisor." *Id.* ¶¶ 54–55. Taking that into account, Staller's firm ("Staller") projected the earnings for two career paths: one where Wang obtained his Ph.D. (the path that his detention prevented) and another where he worked with his master's degree that he had earned (the path that he has pursued instead). *See* ECF No. 21-4 at 3–4. Staller also accounted for Wang's "worklife expectancy," taxes, "fringe benefits," and projected wage growth. *See id.* at 3–5. Because Wang estimated that he would have finished his Ph.D. between 2020 and 2023 had Iran not imprisoned him, Staller calculated a four-point range of lost earnings—one for each possible year of Ph.D. completion. *Id.* at 3, 7. Under the most optimistic timeline, Wang is projected to lose $974,324 because of his captivity. *See id.* at 7. A hypothetical 2023 degree, however, drops that figure to $566,166. Because neither Staller nor Wang offers a way to assess which of the four completion years is most likely, the Court will assume that each

was equally likely, weigh each year equally, and award Wang $772,875 in economic damages.[6]

Qu lost earnings because she had to put her career on hold when Iran imprisoned her husband. Although she "worked a full-time job" during his detention, she could not focus on "career advancement" while also "devot[ing]" time to "get help" for Wang and caring for S.Q. Qu Dec. ¶ 32. Qu had hoped for a higher salary by finding a job as an attorney in 2016—the year Iran detained Wang beginning in August—but did not do so until early 2021, over a year after his release. *See id.* ¶ 43. Staller, accounting for the same variables that he did for Wang's report, calculated how Wang's detention hurt Qu's earnings. *See* ECF No. 21-6 at 4–5. The baseline was Qu's current situation: working as an attorney after receiving that job in March 2021. *See id.* at 4. To estimate her earnings in the no-detention counterfactual, Staller assumed that Qu would have obtained a similar job by January 2017—within a year of starting to look for such a role. *See id.* at 3–4. That assumption is reasonable. Qu obtained that kind of job about 13 months after Wang returned, and that job search likely took longer as she and her family dealt with the aftermath of Wang's detention and readjusted to daily life. *See id.* at 3. So assuming that she would have needed fewer than 13 months in 2016 to get that job is fair. And the reasonableness of Staller's projection for Qu's lost earnings—$452,408—follows naturally from this assumption about when she would have started the higher-paying job. *See id.* at 5–6. The Court will thus award Qu $452,408 in economic damages.

### 2.    Punitive Damages

The Wangs also request punitive damages. These damages aim to "punish and deter" the defendant, and they "are appropriate in cases involving 'outrageous conduct.'" *Hekmati*, 278 F.

---

[6] This calculation assigns each year a 25% likelihood of occurring, so it assigns the projected lost earnings for each year a 25% weight, adds them together, and rounds to the nearest dollar.

Supp. 3d at 166 (citation omitted).  For cases like this one, "[c]ourts have repeatedly held . . . that Iran's actions were outrageous" and justified "substantial punitive damages awards." *Rezaian*, 422 F. Supp. 3d at 183.  Simply put, "[h]olding a man hostage" for years in horrific conditions "to gain leverage" over "the United States is outrageous, deserving of punishment, and surely in need of deterrence." *Id.*

To calculate the dollar amount, the Court considers four factors: (1) the character of Iran's act; (2) the nature and extent of harm that Iran caused or intended to cause the Wangs; (3) the need to deter Iran; and (4) Iran's wealth. *Rezaian*, 422 F. Supp. 3d at 183.  This inquiry does "not differentiate between FSIA causes of action" and "claims brought under state law." *Abedini*, 422 F. Supp. 3d at 141.  These factors have also "yielded several different methods." *Rezaian*, 422 F. Supp. 3d at 183.  The first multiplies the foreign state's expenditures on terrorism "by a factor between three and five." *Id.*  But that method is "commonly used" for "exceptionally deadly attacks." *Id.* (citation omitted).  The second and third approaches are more straightforward, providing for lump sums of "$150,000,000 per affected family" or "an amount equal to the total the compensatory damages." *Id.*  The Wangs contend that option two is appropriate here because Iran used Wang for leverage in negotiations with the U.S.  *See* ECF No. 21-1 at 37–38.

The Court disagrees and finds that tracking the compensatory damages strikes the right balance.  Other courts have taken this approach in cases involving similar Iranian conduct.  For example, the victim in *Hekmati* endured over four years' imprisonment in Evin prison before Iran released him in a deal for "clemency for several Iranians indicted or imprisoned in the United States." 278 F. Supp. 3d at 149, 154.  Rejecting the plaintiff's request for $300,000,000 in punitive damages, the court instead awarded about $32,000,000—the same as his compensatory damages. *Id.* at 167. *Moradi v. Islamic Republic of Iran*, in which the victim's "detention and torture w[ere]

33

carried out directly by Iranian authorities," applied the same approach. 77 F. Supp. 3d at 73. So too in *Abedini*—yet another case involving Iran "falsely imprison[ing] and tortur[ing] in Iranian prison" an American citizen before releasing him in a prisoner deal. 422 F. Supp. 3d at 127, 142. True, the court in *Rezaian* awarded $150,000,000 rather match the compensatory damages. 422 F. Supp. 3d at 183–84. And that court described as an "exacerbating factor" "evidence showing that Iran arrested and detained" the victim "to increase its bargaining leverage in ongoing negotiations with the United States." *Id.* at 184. But *Rezaian* awarded punitive damages on a family-wide basis, which makes sense because Iran "surveilled" one family member and "interrogated another" while holding the victim hostage. *Id.* at 181. Wang's family members, on the other hand, had no such direct contact with Iran. To the extent *Rezaian* suggests that the method of matching compensatory damages is inappropriate whenever the victim is released as part of a prisoner exchange, the Court agrees with the approaches in *Hekmati* and *Abedini*—two cases involving prisoner swaps that still awarded punitive damages mirroring the compensatory awards.

Applying that method here, the Court finds that the Wangs are entitled to punitive damages distributed as follows: $20,432,875 to Wang; $4,452,408 to Qu; $2,500,000 to Lan; and $2,500,000 to S.Q.

### 3.    Post-Judgment Interest

Finally, the Wangs ask for—and are entitled to—post-judgment interest. *See* ECF No. 21-1 at 38. Congress has provided that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Applying this statute "is mandatory, not discretionary." *Winternitz v. Syrian Arab Republic*, No. 17-cv-2104 (TJK), 2022 WL 971328, at *12 (D.D.C. Mar. 31, 2022) (citation omitted). This interest is "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar

week preceding the date of judgment."  § 1961(a).  Further, "[i]nterest shall be computed daily to

the date of payment . . . and shall be compounded annually."  28 U.S.C. § 1961(b).  So the Court

will grant the family's request for post-judgment interest at the statutory rate.

*     *     *

In total, the Court will award damages of $40,865,750 to Wang; $8,904,816 to Qu; and

$5,000,000 to Lan and S.Q. each.  The family is also entitled to post-judgment interest on these

damages.

## IV.     Conclusion

For all the above reasons, the Court will grant the Wangs' Motion for Default Judgment.

A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 12, 2025